WARD *v.* BAILEY, GOVERNOR.

4-5521                                    127 S. W. 2d 272

Opinion delivered April 17, 1939.

*E. Chas. Eichenbaum,* for appellant.

*Jack Holt,* Attorney General and *Jno. P. Streepey,* Asst. Atty. General, for appellee.

GRIFFIN SMITH, C. J. Appellant is a citizen and tax-payer owning a refunding bond issued by the state under authority of act 11, approved February 12, 1934.[1] He asserts invalidity of act 223, approved March 10, 1939. Appellees are the Governor, Lieutenant-Governor, Attorney General, Secretary of State, Treasurer of State, State Bank Commissioner, and State Comptroller, constituting the State Investment Board. The chancellor sustained a demurrer to the complaint.

---

[1] Pope's Digest, § 11237 *et seq.*

Specifically, it is alleged that act 223 [hereafter referred to as the act] is ineffectual because enacted after appropriations aggregating $2,500,000 had been made by the Fifty-second General Assembly; that the bill, not having received a vote equal to three-fourths of all members elected to each branch of the legislature, failed because of § 2 of Amendment 19 to our Constitution.

It is asserted that §§ 2 and 3 are invalid because certain obligations to be refunded did not, as originally executed, carry a pledge of the full faith and credit of the state; that when bonds are sold to raise funds for payment of the old issues, the state's indebtedness will have been increased; and the transactions will offend against Amendment 20 to the Constitution.

Invalidity of § 4 is affirmed because it undertakes to exempt bond income from taxation, in contravention, as it is said, of § 6, Art. XVI, of the Constitution.

Appellant thinks § 7 is unsound because of the method provided for sale of bonds, the directions being ". . . too indefinite to invest the Board with proper ministerial powers."

That § 9 undertakes to create in the State Treasury accounts ". . . which are not within the scope of the sovereign power, and are in contravention of Articles V and VI of the Constitution."

That § 10 is void because it provides for the repurchase of bonds to be held in trust for the benefit of various state funds used in making such purchase, ". . . whereas a purchase, exchange, or receipt of state obligations by the state or any agency thereof is, in effect, a cancellation of said bonds so purchased, exchanged, or received, and the cancellation of said obligations outstanding is an unfair discrimination, pursuant to act 11 of 1934."

Complaint is made of § 11 and its invalidity is urged on the ground that ". . . the language therein used in defining the total amount of money made available to the state for investment is too indefinite to permit the enforcement of said section; . . . that the said act, in making available 50 per cent. of the available daily state fund balances on the records of the Treasurer of

State for the two years preceding the date of advertising is too indefinite to permit enforcement thereof."

Section 18, appellant declares, is in conflict with § 4, Art. XVI, of the Constitution,[2] in that appropriations for fees and services are not definitely fixed.

Powers delegated to the Investment Board by § 19 are not, according to the complaint, functions of government, but are merely commercial transactions, ". . . and clearly in contravention of the Constitution of Arkansas; [and] further, § 19 is invalid for the reason that, in effect, it provides for a pyramiding of the state's indebtedness, constituting an increase of the state's obligations."

Generally, it is alleged that §§ 1 through 21 ". . . are invalid and unconstitutional [because of the reasons specifically assigned], and that investment of the funds in pursuance of the act constitutes a use in contravention of Art. XVI, § 11, of the state Constitution; [and] the act in its entirety is invalid for the reason that the effect of same on the Bond Redemption Fund as set up in act 11 of 1934 . . . will be to deprive said fund of amounts heretofore specifically allocated for the purpose of said Bond Redemption Fund, . . . and for the further reason that the act provides an unwise, speculative venture by the State of Arkansas in the commercial marts, which your plaintiff believes to be against the public policy and definitely proscribed by constitutional limitations."[3]

---

[2] Section 4, Art. XVI, of the Constitution is quoted in full in the seventh subdivision of this opinion.

[3] Act 223 is entitled: "An Act to Provide for Issuance of State Penitentiary Refunding Bonds to Retire Outstanding Penitentiary Funding Notes, Issued Under Authority of Act 246 of 1933, and Outstanding Penitentiary Warrants; for the Issuance of Arkansas State Teachers Refunding Bonds to Retire Outstanding Arkansas State Teachers Certificates of Indebtedness Issued Under the Provisions of Act 89 of 1935; for the Issuance of State Permanent School Refunding Bonds to Retire Permanent School Bonds Issued Under the Provisions of Acts 128 of 1917 and 356 of 1921 and State Debt Board Notes Issued Under the Provisions of Act 337 of 1935; for Investment of a Limited Amount of Cash Balances in the State Treasury in Obligations of the State; for Revenues to Service the Bonds Issued Hereunder; for Appropriations to Carry Out the Provisions of this Act; and for Other Purposes."

*First—Was Act 223 Legally Passed?*—The official calendar of the Fifty-second General Assembly (1939) shows introduction of House Bill No. 216 and its passage by the House February 1 by a vote of 72 to 14; adoption of emergency clause by the same vote. In the Senate two amendments were adopted. There was a ruling by the Lieutenant Governor that 27 votes were necessary to passage. The vote was 25 to 5, with notice of reconsideration. On reconsideration the bill was passed, as amended, by a vote of 32 to 2; emergency clause adopted 30 to 2. It was returned to the House as amended and as passed by the Senate. Senate amendments were concurred in February 17. The bill was ordered engrossed February 20. It was reported correctly engrossed February 21; read the third time; passed February 22 by a vote of 76 to 13; emergency clause adopted by the same vote.

The bill was regularly passed in each branch by a vote of three-fourths of all members elected thereto.

*Second—Bonds of the Penitentiary, State Teachers College, and Permanent School Fund.*—Act 246, approved March 29, 1933, authorized the State Debt Board to issue bonds or notes for the purpose of paying obligations of the State Penitentiary then evidenced by warrants. The bonds, dated January 1, 1934, drew interest at the rate of 3 per cent. per annum, and mature October 1, 1939. By § 8 of the 1933 act it was provided that "The bonds issued pursuant hereto shall be registered with the Treasurer of state, [and] shall carry on the face thereof a pledge of the full credit of the State of Arkansas." The total of such bonds was $308,272. Warrants unfunded amounted to $5,247.67, the two items being $313,519.67.

Act 223 directs issuance of State Penitentiary Refunding Bonds in an amount equal to the combined indebtedness of 1934 penitentiary bonds and the outstanding warrants. Such refunding bonds may be sold, and the proceeds applied in payment of the old bonds and warrants; or, in the alternative, refunding bonds may be exchanged for the old obligations.

While the bonds issued in 1934 and the old warrants are primary obligations of the penitentiary, the credit of the state was pledged to their payment. Act 246 ex-

pressing the pledge was passed prior to effective date of Amendment 20. Therefore, issuance of the new bonds does not come within the prohibition of the amendment.

By act 199 [4] of 1925 the Treasurer of State was directed to transfer $100,000 from the Permanent School Fund and place it to the credit of the State Normal Fund. Arkansas State Teachers College issued its note, at 5 per cent. interest. Interest from 1928 to 1934, inclusive, was not paid. The creative debt, with interest of $35,000 to September 1, 1934, was funded under authority of act 89 of 1935. The original debt to the Permanent School Fund, with interest, was an obligation incurred by direct legislative action. There was an implied commitment that the state would repay the School Fund.

It is urged that payment should be made by the college, as distinguished from the state, and that such payment should come from the institution's apportionment of the cigarette tax. This tax was allocated by act 19 of 1931. The inceptive debt and the promise to pay interest were outstanding before the cigarette tax was dedicated to the building funds. We do not agree that the debt was one other than of state responsibility. [The funded debt of $135,000 had been reduced to $124,000 as of December 31, 1938.]

Act 89 also provided for the funding of a $10,000 indebtedness of the college incurred for materials used in making repairs to buildings, equipment, and utility lines under the federal relief program during 1934 and 1935; also for issuance of $25,000 in certificates of indebtedness to pay residue for construction of a library building. The State Comptroller's report for 1938 shows that unpaid balances of the two items amounted to $6,500 as of December 31, 1938.

---

[4] Act 199 of 1925 required the State Debt Board, composed of the Governor, Secretary of State, and Treasurer of State, to issue a certificate for $100,000, ". . . and [to] deposit said certificate in the Treasury to the credit of the Permanent School Fund," etc. Section 3 required "The interest and payments on this certificate [to] be paid out of the State Normal Fund, and a sufficient portion of the millage tax levied and collected for the maintenance and operation of the State Teachers College is hereby pledged for these purposes."

Authority for construction of the library building is derived from act 133 of 1933, the appropriation having been made from the permanent building fund of the college (the cigarette tax). The state did not, even impliedly, obligate itself to payment of this indebtedness, either by act 133 or by act 89. The balance of $6,500 cannot be included in the refunding operations of act 223. To do so would increase the state's indebtedness without a vote of the people, in violation of Amendment 20.

Act 223 authorized issuance of State Permanent School Refunding Bonds aggregating $397,284.42.

In 1917, when 5 per cent. Permanent School Fund Bonds were substituted for 3 per cent. bonds, total securities amounted to $1,134,500. In 1929-30, $1,000,000 of Revolving Loan Fund Bonds were sold and proceeds ($996,311.68) deposited in the treasury. The continuing bond account should have been the difference between $1,134,500 and $996,000. Therefore, interest-bearing bonds chargeable to the treasurer, and standing to the credit of the Permanent School Fund, were $138,500.[5]

In 1921[6] general revenue was used by the penitentiary as an instrumentality for borrowing from the Permanent School Fund, and the State Debt Board deposited 5 per cent bonds amounting to $180,000. These two items —$138,500 and $180,000—constitute the claim of $318,500 acknowledged by the state to be due the Permanent School Fund.

Act 337 of 1935 directed the State Comptroller ". . . to report in writing to the State Debt Board a detailed account of his findings with reference to the Permanent School Fund accounts, and to recommend adjustments necessary to balance the accounts and estab-

[5] Act 128 of 1917 directed substitution of 5 per cent. bonds for 3 per cent. bonds "now held in the treasury to the credit of the school fund." A property tax of ⅛th of a mill was levied as an "interest sinking fund" for the purpose of paying the annual interest on the Permanent School Fund.

[6] Act 356 of 1921 directed the Treasurer of State to transfer $180,000 from the Permanent School Fund to the General Revenue Fund, interest to be paid from the State Sinking Fund. Act 357 of 1921 directed the Treasurer to transfer $180,000 from the General Revenue Fund to the "Special Penitentiary Fund."

lish the true amount of Permanent School Fund Bonds which are outstanding."

The report was made September 1, 1935. Among other recommendations was one for issuance of $78,784.42 of State Debt Board Notes to the Common School Fund in payment of interest on Permanent School Fund Bonds to September 1, 1934. The State Debt Board duly received and approved the report.

It will be observed that the transactions involving $138,500, $180,000, and $78,784.42, were acts of the State Debt Board. Subject matter in each instance was an indebtedness existing prior to adoption of Amendment 20. Hence, these obligations may be treated in the manner provided by act 223, without violating the amendment.

*Third—Tax Exemptions.*—Article XVI, § 6, of our Constitution is: "All laws exempting property from taxation other than as provided in this Constitution shall be void."

Section 4 of act 223, in respect of State Penitentiary Refunding Bonds, Arkansas State Teachers Refunding Bonds, and State Permanent School Refunding Bonds, provides that they shall be the negotiable, direct, general obligations of the state for the payment of which, principal and interest, the full faith and credit of the state and all of its resources are pledged, [and] "The income from such refunding bonds shall be non-taxable . . ."

Appellee construes this provision to exempt income from such bonds from the income tax law of 1929 [act 118]. Under this construction the exemption is valid. The Legislature cannot, however, exempt from general taxation bonds or the income therefrom. Bonds are property within the meaning of our Constitution. Bond earnings, if paid, become money in possession, and are therefore property; if unpaid, the interest enhances the value of such bonds and appreciates their worth as property.

*Fourth—Indefinite Directions to Investment Board.* —The General Assembly has clearly directed how Penitentiary Refunding Bonds, State Teachers Refunding Bonds, and Permanent School Refunding Bonds shall be sold. There are provisions for notice by publication, description of the bonds, exaction of a deposit by bidders

as evidence of good faith, etc. The right is conferred upon the board to reject unsatisfactory bids, and to exchange new bonds for the old bonds in lieu of payment. Sales may not be made at less than par and accrued interest.

Some discretion is vested in the board, including the determination of bond maturities, but interest rates cannot exceed three per cent. Appellant's objections are not sustained.

*Fifth—Repurchase of Bonds.*—Section 10 of the act empowers the board to purchase [from an appropriation of $4,000,000 carried in § 18] ". . . State of Arkansas interest-bearing, direct general obligation bonds, executed by state officials, for which the faith and credit of the state are pledged." There is this direction:

"The board shall, as soon as practicable, and from time to time, give notice by publication that it desires to purchase for the state, bonds of the character which it is authorized by this act to purchase. Not more than thirty days nor less than twenty days prior to the time of the offer of bonds for sale to the state, the board shall cause to be published . . . notice requesting offers to sell bonds to the state and fixing the time and place at the State Capitol Building in the city of Little Rock, at which such offers will be received.

"On the date and time fixed for the purchase of bonds the board, or one or more members thereof, shall open and carefully compare the offers made. All bonds shall be purchased with primary regard to the best interest of the state's credit standing and revenues.

"No purchase, exchange or receipt of state obligations by the State Investment Board shall ever be construed as a cancellation of the obligations so purchased, exchanged or received and all state bonds and other obligations purchased and received by the State Investment Board under the terms of this act shall be held in trust for the use and benefit of the various state funds used in such purchases, this trust being subject only to the right to hypothecate, sell or exchange such obligations under the provisions of this act."

A limitation of the board's authority to exercise the powers conferred by § 10 is found in § 11, where it is enacted that "The total amount of moneys hereby made available to the board for investment shall not exceed, in the aggregate, fifty per cent. of the average daily state fund balances on the records of the treasurer of state for the two years preceding the dates of advertising for the purchase of bonds. The board shall decide upon the maximum amount to be used in the purchase of bonds on any advertised offering date and such amount shall be specified in the notice. The funds to be used in the purchase of bonds, referred to in this section, are moneys which may hereafter be deposited in banks to the credit of the treasurer of state."

Appellant's objection is that when the state purchases bonds, the effect is a cancellation, and this, he says, ". . . is an unfair discrimination, pursuant to act 11 of 1934."

Actually, the question involved is whether, in directing the investment of treasury cash balances in bonds of the state, the Legislature has infringed upon § 11 of art. 16 of the Constitution, which provides: "No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same; and no money arising from a tax levied for one purpose shall be used for any other purpose."

This court, in *Collins* v. *Humphrey*,[7] (opinion by Chief Justice HART), held that the restrictions of art. 16, § 11, are applicable to all subjects of taxation, and not alone to property taxes, saying: "It was intended that no money arising from a tax levied for one purpose shall be used for any other purpose . . . In other words, the Legislature has no power to divert a fund after the tax has been levied and collected, and transfer it to another and separate purpose. If it could transfer the funds thus levied and collected, it might seriously embarrass the administration of the state government." The opinion contains this further statement: "Our Constitution has set aside certain revenue raised from property taxes to be held sacred for the benefit of common schools,

[7] 181 Ark. 609, 27 S. W. 2d 102.

and the Legislature is without power to divert it. The funds here sought to be diverted from the common schools is not set aside by the Constitution for that purpose. The application of the taxes raised under both the Severance Tax Law and the Income Tax Act of 1929 is left entirely to the control of the Legislature, there being no restriction of their application in the Constitution."

Clearly, the purpose in authorizing purchase by the state of its own general obligation bonds was to provide a method by which treasury cash balances would earn an income. Section 12 of the act directs that "The interest received from all bonds in the Bond Purchase Account [created in the treasury] shall be credited by the treasurer to the State Sinking Fund.[8] All moneys credited to the State Sinking Fund during any fiscal year in excess of the debt service requirements for such year shall be transferred . . . to the Excess Par Value Bond Account. The principal amount of any bonds, when paid, shall be charged to the Bond Purchase Account and credited to the Cash Account in the state treasury. In the event the State Depository Board determines it to be necessary to sell any bonds in the Bond Purchase Account for the purpose of increasing the Cash Account in the state treasury to meet unusual demands for such cash [§ 13], then such State Depository Board shall notify the State Investment Board to that effect and set out the amount of cash needed. Thereupon, the board shall decide which of the bonds in the Bond Purchase Account shall be offered for sale." Notice shall be given, etc. The board determines the best bid. There is no restriction against a less-than-par sale.

Section 18, in addition to appropriating $313,519.67 to facilitate handling of penitentiary bonds, contains this provision:

"After the effective date of this act, all moneys collected and paid into the state treasury shall, for the purpose of this act, be deemed to be revenues available for investment in the manner provided herein. There is here-

---

[8] From the State Sinking Fund interest on certain obligations is paid; if the Sinking Fund is insufficient, recourse is had to the General Revenue Fund.

by appropriated out of such revenues for the purpose of investment the sum of $4,000,000.''

Is the use to be made of the four million dollars (or any part of it) a diversion of moneys collected for a specific purpose? Does it result in applying such funds to a purpose impliedly prohibited by § 11 of art. 16 of our Constitution?

The authority conferred by § 11, making available to the board for investment purposes an amount ''. . . not to exceed, in the aggregate, 50 per cent. of the average *state fund balances* [based] on the records of the state treasurer for the two years preceding the date of advertising for the purchase of bonds,'' must be construed in connection with the appropriation of $4,000,000. Each is a limitation upon the other. If the average [state fund] balances exceeds $8,000,000, still not more than $4,000,000 may be used. If, on the other hand, such balances are less than $8,000,000, the full sum of $4,000,000 cannot be used.

The term ''state fund balances'' is obviously used in § 11 to carry a particular meaning. The question arises, Are we to construe this language to include the general revenue alone (which, admittedly, is a state fund, not created under a tax levied for a specific purpose), or are we to say that public school funds, game commission revenues, funds arising from ad valorem taxes for the express benefit of certain institutions or agencies, and others of like significance, are not state fund balances, and therefore are not within the purview of the investment provision?

Shall we adopt a restrictive construction, and say that because act 11 of 1934 dedicates certain funds as highway revenues and in effect makes the state a trustee, the general cash balances in the treasury must not be used for purposes expressed in § 10 of act 223? Or, shall we say that bonds purchased in the manner proposed are cash items in the treasury, permissively substituted for the actual money originating in tax sources?

If we adopt the latter construction, there is a possible loss to tax funds. If the contingency recognized in § 13 should arise, and it became necessary as an emer-

gency measure to sell the investment bonds, there might not be a ready market nor a par bid; yet, under existing laws, the treasurer places millions of dollars with banks, without interest, and the only guarantee of demand availability is the bank's stability, plus $5,000 deposit insurance of the federal government.

The Legislature, unless prohibited by the Constitution, has a right to declare the fiscal policy we have discussed, and under the scheme of investment, large sums of money may be earned for the state. Certainly there is no express denial of the state's right to purchase its ᵔᵔ bonds, and if the plan of § 10 is to be condemned, that condemnation must be implied.

The accepted rule of construction is that ". . . an act of the General Assembly is presumed to be framed in accordance with the Constitution, and it should not be held invalid for repugnance thereto unless such conflict be clear and unmistakable."—*Dobson* v. *State*, 69 Ark. 376, 63 S. W. 796. "The courts have nothing to do with the wisdom or expediency of a statute."—*Fort Smith* v. *Scruggs*, 70 Ark. 549, 69 S. W. 679, 58 L. R. A. 921, 91 Am. St. 100. "The mere fact that a statute may seem to be more or less unreasonable and unwise does not justify a court in annulling it, as courts do not supervise legislation and keep it within the bounds of propriety and common sense."—*Little Rock* v. *North Little Rock*, 72 Ark. 195, 79 S. W. 785.

These expressions are in accord with the course of construction and operation of statutes. Citation of authority to reinforce such canons would be cumulative.

For the moment we suspend discussion of the state's right to purchase its bonds, and will turn our attention to § 19 of the act, wherein it is provided:

"The State Investment Board is further authorized and empowered to borrow money from a bank, trust company, or any other lending agency, or from any federal agency and secure the payment of the same by pledging the bonds, or any portion thereof, purchased under the provisions of § 10 of this act. Such money so borrowed shall be used to purchase bonds in the manner and of the kind and character described in said § 10, and the

bonds so purchased by the board may be pledged as herein provided for borrowing more money with which to purchase additional bonds and such operation of borrowing money, pledging bonds as security for money borrowed and purchasing additional bonds may be repeated from time to time as in the discretion of the Board may seem advisable.

"No money shall be borrowed at a greater rate of interest than the lowest rate of interest drawn by any of the bonds so pledged, and no money shall be so borrowed for a greater length of time than six months, but loans may be renewed from time to time with the same or like security and for the same length of time as the original loan. Interest may be paid on the money thus borrowed out of interest payments on the bonds so pledged. At no time shall the money so borrowed exceed the principal of bonds pledged, and no evidences of debt or pledges of securities under this section shall be construed as increasing the state's existing outstanding indebtedness. For the purposes of this section there is hereby appropriated for the use of the State Investment Board the sum of $6,000,000."

Here the Board is empowered to invest and reinvest. Assuming that under authority of § 10, the state acquires $4,000,000 of bonds: the Board may take these securities and pledge them for additional funds. The language used is that the Board may "borrow," and that ". . . such money so borrowed shall be used to purchase bonds in the manner and of the kind and character described in § 10."

With $4,000,000 of bonds representing money paid from state fund balances in making purchases (but theoretically held in the treasury in substitution) the Board may borrow from a bank, trust company, or other lending agency, and execute the state's promise of repayment. The promise is redeemable in not more than six months, but ". . . loans may be renewed from time to time with the same or like security and for the same length of time as the original loan."

The difficulty here encountered is twofold: If the Board pledges $4,000,000 of bonds for $3,500,000 of new

money [a purely arbitrary figure adapted to this opinion], the new money must be deposited in the treasury, and it is subject to use in buying more bonds. But the treasury, in the first instance, [if we assume the lending agency will require margins in bonds in excess of loans, and if we further assume the bonds were purchased at approximate par] will have paid out $4,000,000, and when the treasurer parts with such bonds he receives only that percentage the lending agency is willing to advance.

In the case of a $4,000,000 bond hypothecation for an assumed $3,500,000 loan of new money, there would be a shortage of $500,000 in the treasurer's accounts. This condition is not sterilized by language of § 10 that the trust created in the bonds is ". . . subject only to the right to hypothecate, sell or exchange such bonds under the provisions of this act."

If it be urged that no such shortage in fact exists; that the primary bonds are still constructively in the treasurer's custody (but pledged for $3,500,000 new money), the contradiction is that under its pledge the lender has a right to sell if the state fails to repay the loan. From proceeds the lender may first reimburse itself.

The pyramiding process under § 19 may go on indefinitely but for the limitation of the appropriation to $6,000,000. The result would be that as an incident to each transaction there will be an increase of the treasurer's contingent loss on the initial venture—this to continue as long as new money acquired from time to time does not equal the purchase price of the pledged bonds.

We now return to a consideration of the status of bonds purchased under authority of § 10.

Accepting, as we do, the theory that when bonds are treated as cash the constitutional prohibition against diversion will not have been violated if highway revenues dedicated under act 11 of 1934, and the common school funds, are excluded from use, this theory becomes a fantasy if the board may cause the bonds to be taken from the treasury without substituting an equivalent—either cash, or par value securities of acceptable character.

We know that common school funds, and other funds which under the organic law cannot be taken for alien purposes, are included in the average daily balances referred to in § 11. We know that highway revenues, heretofore in effect declared to be trust funds, are a part of the balances from which the $4,000,000 appropriation is made, because it is enacted that ". . . *all* moneys collected and paid into the state treasury shall, for the purpose of this act, be deemed to be revenues available for investment." Nothing is excepted.

But we must not assume that mere availability of the appropriation will cause the Board to utilize highway trust funds in the purchase of bonds, nor that the Board will take from the school fund moneys constitutionally protected.

By act 11 of 1934 [9] the state assumed definite obligations in exchange for considerations agreed upon. The act is too voluminous to be analyzed here; but certainly it contains commitments in respect of funds which clothe such funds with the attributes of a trust.

If it be urged that the power of a state to violate its trust is inherent in the General Assembly (though the obligations of the contract cannot be impaired), the answer is that the Legislature has no power to divert a fund after the tax has been levied and the money collected, and, as Judge HART said in the Collins-Humphrey Case, "transfer it to another and separate purpose." The 1934 refunding law enumerates the purposes for which highway revenues may be used, and by affirmative declaration excludes all other uses. To permit use of highway funds in buying bonds (including highway bonds) in a manner contrary to the refunding law would violate the obligations incurred when the state guaranteed that such

---

[9] The last paragraph of § 2 of act 11 of 1934 is: "The transfer or appropriation of any money from the State Highway Fund, or from the State Highway Revenues, or of any funds arising from motor vehicle licenses, fees or taxes, or from taxes on gasoline, to or for any purpose other than as specified in this act, and expenses of collection, shall be deemed to be an immediate default on the part of the State with respect to the obligations authorized to be issued hereunder."

revenues would be kept intact within certain created accounts.

However, there *are* available funds for the Board's utilization, and the enactment is not invalid *per se*. We hold, therefore, that the Board may proceed under the plan of § 10 and purchase bonds with $4,000,000, or take for such purpose a sum not in excess of 50 per cent. of the balances as defined, exclusive of the school and highway revenues as herein identified.

*Sixth—Sections 10 and 19 in Conflict.*—As has heretofore been shown, bonds purchased from "state fund balances" shall be held in trust. When bonds are pledged to lending agencies the trust is violated because the lender has authority to sell the collateral; and this is true notwithstanding express authority under the act to make the pledge. Possession and dispossession cannot concurrently exist.

If loans should be made on notes or other forms of promise executed by the Board, the created status is that of borrower and lender, the primary obligation being the state's promise to pay, the collateral being secondary to the promise. For bookkeeping purposes, the debt of the state has been increased to the extent of the note or notes—and in fact, these new obligations are *bonds* within accepted definitions. The lender cannot sue the state, but the state may legally give its promise unless the particular promise is prohibited by the organic law. If the promise is broken, obligations of the contract remain, but without facility of enforcement. The trust fund, then, is in reality all the lender may administer upon in the event of state default.

But Amendment 20 says the state shall issue no bonds or other evidence of indebtedness pledging the faith and credit of the state "*or any of its revenues for any purpose whatsoever.*"

If money is taken from state fund balances and invested in bonds in trust, and if these bonds are cash items in substitution of the actual money, and if the state cannot pledge (for new debt purposes) "*any of its revenues for any purpose whatsoever,*" and if a note or promise executed by the Board is a bond—then how can

it be said that revenues of the state are not being pledged in a manner contrary to the purposes of Amendment 20?

*Seventh—The Appropriation of $5,000.*—Section 18 carries an appropriation of $5,000 from the State Sinking Fund for the biennial period ending June 30, 1941, ". . . for the purpose of paying for legal notices, printing and lithographing bonds, approving opinions, and for all other expenses incidental to carrying out the provisions of [the] act."

This is not an omnibus appropriation of the kind prohibited by § 30 of art. 5 of the Constitution. The money is made available to the Board for payment of necessary expenses, but these expenses must not include salaries and fees. In order to pay salaries and fees there must have been compliance with § 4 of art. 16 of the Constitution, which provides: "The General Assembly shall fix the salaries and fees of all officers of the state, and no greater salary or fee than that fixed by law shall be paid to any officer, employee, or other person; . . . and the number and salaries of the clerks and employees of the different departments of the state shall be fixed by law." [10]

*Eighth—Bonds Not to Be Cancelled.*—While ordinarily a purchase by the state of its own bonds would have the effect of cancellation, it is within the power of the Legislature to permit such bonds to be bought and held in trust (as the act provides) for the benefit of the several funds from which purchase money is taken. There is at least the fiction of an existing indebtedness. If purchase did, in fact, effect cancellation, then to that extent the state's debt would be reduced. If after cancellation the bond should be sold, the state's debt would be increased. Since there is no cancellation, but merely an acquirement in trust, we think the Legislature did not transcend its authority in declaring the policy.

The decree is modified to conform to this opinion, and as so modified it is affirmed.

Smith, Mehaffy and McHaney, JJ., dissent as to modification.

---

[10] *Nixon* v. *Allen*, 150 Ark. 244, 234 S. W. 45; *Pulaski County* v. *Caple*, 191 Ark. 340, 86 S. W. 2d 4.