MILES *v.* GORDON.

5-2651                                              353 S. W. 2d 157

Opinion delivered January 29, 1962.

*Nance & Nance,* for appellant.

*Frank Holt,* Attorney General; *Mehaffy, Smith & Williams,* by *W. J. Smith, Herschel H. Friday, Jr.,* and *James E. Westbrook,* for appellee.

CARLETON HARRIS, Chief Justice. Maxine Miles, appellant herein, is a citizen, resident, and taxpayer of the city of West Memphis, and owns real and personal property therein. Appellees are the qualified and acting members of the State Reserve Fund Commission. The interveners are the Boards of Trustees of the University and state supported colleges. Appellant, proceeding as a taxpayer, instituted suit in the Chancery Court of Pulaski County, seeking a declaratory decree holding Act 65 of 1961 unconstitutional, and further asking an injunction to prohibit appellees from complying with, or in any manner carrying out, the provisions of said act. The court sustained a demurrer to the complaint and, after appellant declined to plead further, entered a decree dismissing the complaint. From such decree, comes this appeal.

The First Extraordinary Session of the 1961 General Assembly passed Act 65 as a means of financing construction at the various state institutions heretofore mentioned. This legislation was occasioned by the fact that several million dollars are being held in the permanent operating reserve fund (a part of the revenue sta-

bilization reserve fund), and the legislature desired that such fund should be used for the construction. The money in this fund has been used to implement a policy of preserving an even flow[1] of moneys to the various state agencies. Act 65 was passed as a means to use the money, and at the same time, maintain the advantages of the even flow. The act establishes the State Reserve Fund Commission and authorizes that Commission to borrow money and issue Certificates of Indebtedness to evidence its debt. The money is to be borrowed from the State, acting through the State Board of Finance, which has been investing the daily balances of the State since the approval of this practice by this Court in 1939. The borrowed money will be repaid with the interest received from the investment of state funds by the State Board of Finance. This interest will be placed into a special fund and pledged to the payment of the certificates, and is to be the sole source from which payment may be made. The money obtained by the issuance of the certificates will be turned over to the chief fiscal officer of the State for use in preserving an even flow of money to the various recipients of state funds.

Appellant contends that Act 65 is unconstitutional, and in seeking a reversal of the Chancery decree, asserts four points, which we proceed to discuss in the order listed in appellant's brief.

## "I.

Act 65 of 1961 Provides for the Withdrawal of Funds from the State Treasury in the Absence of Specific Appropriations and Thus is Contrary to Article 5, Section 29 and Article 16, Section 12 of the Arkansas Constitution."

---

[1] General revenues of the State are not received in equal monthly amounts; for instance, July through February (excluding November), are months of lowest tax collections, and November, and March through June are months of highest tax collections. Accordingly, through a permanent revolving fund, advances of moneys may be made to the several operating fund accounts during low revenue months, and these advances of moneys are repaid during high revenue months. This results in the restoration of the full amount in the revolving fund at the end of each fiscal year making the same amount of moneys available for another cycle of similar transactions.

Article 5, Section 29, of our State Constitution provides, *inter alia,* that no money shall be drawn from the Treasury except in pursuance of specific appropriation made by law, and no appropriation shall be for a longer period than two years. Article 16, Section 12, has substantially the same requirement. Under the provisions of Section 8 of Act 65, the interest derived from the investment of daily balances of state funds is pledged to the payment of certificates of indebtedness to be issued by the Reserve Fund Commission, and the certificates are to mature fifteen years from the date of the first certificate issued. Appellant points out that this interest is pledged rather than appropriated, and is pledged for a period of fifteen years, thirteen years, according to her contention, in excess of the maximum period for which an appropriation may be made. Appellant recognizes that this Court has previously held that all public money does not have to be paid into the State Treasury. In *Gipson* v. *Ingram,* 215 Ark. 812, 223 S. W. 2d 595, we held, "There is no language in our present Constitution which requires that all of the public money shall be paid into the State Treasury. Such a provision exists in the constitutions of some states, but not in our present Constitution." One of the questions in that case was whether the Constitution required that "cash funds" be deposited in the State Treasury. This Court defined "cash funds" as "those received by the state agencies and institutions from sources other than taxes, as the term 'taxes' is ordinarily used", and declared that the Legislature was empowered to determine whether the State Treasurer should be required to receive all state funds. But, says appellant, the interest here in question is not embraced within the term "cash funds"; rather, since it is interest on tax money, the interest itself falls within the category of tax money. The case of *Pomona City School District* v. *Payne,* 9 Cal. 510, 501 P. 2d 822, wherein it was held that the County of Los Angeles could not keep the interest obtained through the investment of school district funds on deposit in the county treasury, is cited. The Court there stated that interest is

an accretion or increment to the principal fund earning it, and becomes a part thereof. In that very case, however, the California Court limited this generally recognized concept of law by stating that interest is an accretion to the principal fund earning it, and becomes a part thereof *"unless lawfully separated therefrom."*[2] The Court said, "In fact, the rule of law would control that the right of depositors to their interest increments could not be taken away without direct statutory authority to that effect."[3] We concur with that statement of the law. Here, we think it immaterial how the interest may be designated, be it "cash funds", or by some other name. The pertinent questions are whether the General Assembly had the authority to determine whether certain funds shall be paid into the State Treasury; whether the Legislature likewise had the authority to lawfully separate the interest in question from the invested tax funds that produced it, and whether the interest must be classified as "taxes."

It is apparent from a study of the decision rendered in *Gipson* v. *Ingram, supra,* that the Court's conclusions were based on the holding that the Legislature had the authority to determine whether certain designated funds should be paid into the State Treasury. We are likewise of the opinion that the Legislature is not prohibited by our Constitution from separating the interest from the principal and pledging it, as in Act 65. For that matter, taxes and interest are not the same. Taxes are enforced contributions exacted pursuant to statutory authority, while interest is the price paid by a borrower for the use of what he borrows, generally a percentage on the principal amount. We hold that interest, when separated from the principal by legislative enactment, is not "taxes", as the term is ordinarily used, and there is no requirement that this interest be deposited in the State Treasury; this being true, there is no necessity for the biennial appropriation.

---

[2] Emphasis supplied.

[3] In that case, no direct statutory authority had been granted.

Appellant devotes several paragraphs to possible abuses that might arise where independent state commissions are entrusted with public moneys, and over which the Legislature exercises no control with regard to the expenditure of the funds. However, in determining constitutionality of acts, we are not permitted to pass upon the wisdom of the legislation. This is the prerogative of the Legislature. As was stated in *Atkins* v. *Kansas*, 191 U. S. 207:

"So, also, if it be said that a statute like the one before us is mischievous in its tendencies, the answer is that the responsibility therefor rests upon legislators, not upon the courts. No evils arising from such legislation could be more far reaching than those that might come to our system of government if the judiciary, abandoning the sphere assigned to it by the fundamental law, should enter the domain of legislation, and, upon grounds merely of justice or reason or wisdom, annul statutes that had received the sanction of the people's representatives."

"II.

Act 65 Provides for the Issuance of Certificates of Indebtedness to Which Revenues of the State are Pledged Without Approval by the Electors of the State and is Therefore Contrary to Article 16, Section 1 as Amended by Amendment No. 13, and Amendment 20 to the Arkansas Constitution."

Article 16, Section 1, of the Arkansas Constitution provides, *inter alia,* that the state shall not lend its credit for any purpose whatever. The answer to that argument is simply that Act 65 does not call for the State to lend its credit. The obligation arising under Act 65 is solely that of the Reserve Fund Commission. In *Brown* v. *The Arkansas Centennial Commission,* 194 Ark. 479, 107 S. W. 2d 537, the same contention was made in an attack upon Act 180 of 1935. This Court, after citing language of the Act to the effect that no bond,

note, or other evidence of indebtedness issued under the Act or created by the Commission should be held or construed as an obligation of the State of Arkansas, stated:

"It is plainly manifest from this language that the bonds to be issued are not obligations of the State, but 'shall be solely and exclusively the obligations of the Commission in its corporate and representative capacity.' This language is too plain to be misunderstood and is not open to construction. So the State is not lending its credit and it is not issuing any interest-bearing treasury warrants or script, and the provisions of said section of the Constitution are not invaded."

Amendment No. 20 to the Arkansas Constitution provides in part:

"Except for the purpose of refunding the outstanding indebtedness of the state and for assuming and refunding valid outstanding road improvement district bonds, the State of Arkansas shall issue no bonds or other evidence of indebtedness pledging the faith and credit of the State or any of its revenues for any purpose whatsoever, except by and with the consent of the majority of the qualified electors of the State voting on the question at a general election or at a special election called for that purpose."

Appellant contends that Act 65 violates this constitutional prohibition, asserting that state revenues are pledged without the consent of the qualified electors. We do not agree. This argument is rendered ineffective because of our holdings in *Davis* v. *Phipps,* 191 Ark. 298, 85 S. W. 2d 1020, *Jacobs* v. *Sharp,* 211 Ark. 865, 302 S. W. 2d 964, and *McArthur* v. *Smallwood,* 225 Ark. 328, 281 S. W. 2d 429. In the first case, we upheld the issuance of bonds by the State Board of Education, to be secured by school district bonds delivered to the State Board of Education as security for loans from the revolving fund. In *Jacobs* v. *Sharp, supra,* we upheld the issuance of bonds to finance the construction of buildings by state institutions, and dormitory rental charges were to be

pledged to the payment of the bonds. In *McArthur* v. *Smallwood, supra,* this Court again upheld the issuance of bonds by the Justice Building Commission to obtain funds for the construction of the Justice Building. The Legislature levied certain charges to the filing of cases in court, and this levy, together with lease rentals to be paid by the Workmen's Compensation Commission, the Public Service Commission, and the proceeds of the sale of the old Workmen's Compensation Building, were pledged to the payment of these bonds. The purpose of Amendment 20 is well expressed in *Davis* v. *Phipps, supra,* as follows:

"Amendment No. 20 provides that the State of Arkansas shall issue no bonds, or other evidences of indebtedness, pledging any of the revenues of the State, except when authorized by a majority vote of the qualified electors of the State. If the securities pledged for the payment of these bonds, which the State Board of Education desires to issue, may be deemed revenues of the State of Arkansas, then it is doubtful if such security could be legally pledged.

There should not be very much difficulty in a proper understanding and interpretation of what is meant by the language of Amendment No. 20, which prohibits the pledging of the State's revenues. Citizens of the State who have been interested in its welfare and who have attempted to keep themselves reasonably well-informed know what the evils were for which Amendment No. 20 was framed to cure. It must be a fact well recognized in State history that, at the time Amendment No. 20 was being considered by the electors of the State, the financial affairs of our Commonwealth had been well-nigh wrecked by issuance of bonds far in excess of the amount justified by the liquid resources of the State. High taxes had been imposed to raise revenues to meet these enormous obligations. It was well understood then, as it is now, that a continuation of these practices that had grown up were pyramiding debts and tapping every source of revenue for payment thereof and could not continue without practical bankruptcy. * * *

But, aside from further speculation, we may say that Amendment No. 20 prohibits bonds or instruments issued by the State itself for the security of which is pledged the State's faith and credit. A bond is a written promise to pay money, and we have said, in the foregoing discussion, that the State is not issuing these bonds, and it would not be bound for their payment. Therefore, these bonds, which the State Board of Education is about to issue, are not within the prohibited class.''

In *McArthur* v. *Smallwood, supra,* this Court, quoting from the Michigan Supreme Court, stated:

''The bonds provided for are to be paid from a special fund and solely from anticipated revenues to be derived from the sale of cigarettes. They are not, and cannot be, a general obligation of the state. In the event the anticipated profits do not materialize and the fund becomes exhausted, the purchaser of the bonds has no legal redress against the state. He must look solely to the fund upon which they are drawn.''

Further, in referring to our own cases:

''The moneys pledged to the payment of the bonds in the *Jacobs* v. *Sharp* decision, *supra,* were admittedly public revenues. Therefore, it seems to be well established by the decisions of this Court that the pledging of so-called state or public revenues is not prohibited by Amendment No. 20 unless the pledge is to the payment of State of Arkansas bonds.''

In the cases just cited, we held that the dangers which Amendment No. 20 was designed to protect against, did not exist, because the revenues pledged to the incurred obligations were clearly defined sources of revenue, and the pledges to the payment of the indebtedness were clearly limited. This logic is equally true as to the certificates of indebtedness here in question. They are payable only from the interest derived from the investment of daily treasury balances, and are solely the obligation of the State Reserve Fund Commission. The last paragraph of Section 5 of Act 65 plainly states:

"The Certificates and interest thereon shall be payable solely from and secured by a pledge of the gross revenues of the Commission, hereafter in this Act provided and defined, which revenues are hereby specifically declared to be cash funds received from sources other than taxes, restricted in their use, and dedicated solely for the purposes set forth herein, and the Commission is hereby authorized and empowered to make a pledge of said gross revenues in the resolution authorizing the issuance of the Certificates. The Certificates shall be general obligations only of the Commission, and in no event shall they constitute an indebtedness for which the faith and credit of the State of Arkansas or any of its revenues are pledged."

Appellant's contention is without merit.

———

## "III.

The Authority Given to the State Board of Finance to Purchase the Certificates of Indebteness is Contrary to the Arkansas Constitution in That the Certificates Constitute a Speculative Investment That Will Not be Readily Marketable and Thus Will Impair the State's Ability to Meet Its Obligations."

A good part of the argument under this point is devoted to the advisability of the legislation, and we have already stated that we are not, as a court, concerned with the wisdom of measures enacted into law. Appellant recognizes that this Court has already approved the investment of state funds. *Ward* v. *Bailey*, 198 Ark. 27, 127 S. W. 2d 272. In *Halbert* v. *Helena-West Helena Industrial Development Corporation*, 226 Ark. 620, 291 S. W. 2d 802, and *Andres* v. *First Arkansas Development Finance Corporation*, 230 Ark. 594, 324 S. W. 2d 97, we held that state funds could properly be invested in bonds of local industrial corporations. Appellees point out that in any comparison of the degree of speculation and marketability, the certificates under discussion would appear to be a much sounder investment than the

bonds of a local industrial development corporation. From appellees' brief:

"The interest with which the certificates are to be paid has been coming in regularly in predictable amounts ever since the investment of State funds was authorized. In fact, the official records of the state reflect that the proceeds of such interest have been coming in in amounts that indicate that the certificates will be retired well in advance of their maturity date. The bonds of local industrial development corporations, on the other hand, depend for their payment upon the lease rentals to be paid by a specific industry which has leased the plant constructed with the proceeds of bonds. The bonds are only as good as the particular lessee, and frequently the lessee is a company with very little capital and/or very little experience in the business. In fact, these bonds were so unacceptable and so difficult to market that the people of Arkansas had to turn to other means of financing industrial development. (Amendment 49, and Act 9 of 1961)."

It is also pointed out that the safeguards provided in Act 65 further demonstrate the soundness of the certificates. Subsection (A) of Section 7 provides:

"For the purpose of providing additional revenues, and a better safeguard for state funds, the Board is hereby authorized and empowered to purchase, from time to time, with funds as in this section hereinafter specified, direct obligations of the United States of America, and of the State of Arkansas, and State Budget Revolving Fund Certificates of Indebtedness, but only to an extent such that not exceeding seventy-five per cent (75%) of the average daily balances of state funds on the records of the Treasurer of State for the two (2) years immediately preceding the date or dates set for the purchase of said obligations shall be represented at any one time by the aggregate of the obligations so purchased and owned by the State."[4]

---

[4] This amended sub-section (A) of Section 3 of Act 338, approved March 24, 1955.

Sections 11 and 13[5] provide additional safeguards.

"IV.

Act 65 Delegates Legislative Power to the State Board of Finance and is Thus in Violation of Article 5, Section 1, as Amended by Amendment No. 7, and Article 4, Sections 1 and 2 of the Arkansas Constitution."

Article 5, Section 1, of the Constitution, as amended by Amendment No. 7,[6] places the legislative power in the General Assembly. Article 4, Section 1, of the Constitution, divides the powers of government into three departments, legislative, executive, and judicial. Article 4, Secion 2, states:

"No person, or collection of persons, being one of these departments, shall exercise any power belonging

---

[5] "Section 13. (A) It shall be the duty of the State Board of Finance to keep itself continuously advised as to the amount of the average daily State fund balances in the State Treasury; and whenever, on the last day of any month, the said Board shall determine that the aggregate total principal amount of securities held in the Securities Account in the State Treasury shall exceed seventy-five per cent (75%) of the amount of the average daily State fund balances for the next preceding two-year period, it shall proceed immediately to sell such principal amount of securities as shall be required to reduce the total principal amount of holdings in said Securities Account to not more than the said seventy-five per cent (75%) of the average daily State fund balances for the next preceding two-year period.

(B) If, as the result of any such sale or of any other condition or circumstance hereafter arising, the State Board of Finance shall determine that the interest income derived from securities held in the Securities Account, and by this Act denominated cash funds available to the Commission only for the purpose of meeting the debt service requirements of its outstanding Certificates of Indebtedness, shall be insufficient to fully amortize said Certificates on or before the date of maturity thereof, it shall, in the exercise of its best judgment, determine the amount thereof which cannot be so amortized, and immediately thereafter file its certificate with the State Treasurer setting forth therein the said amount. As soon as may be done after the receipt of any such certificate, but not later than the end of the then current fiscal year, it shall be the duty of the State Treasurer, by appropriate entry upon his records, to reduce the balance in the Revolving Fund by the amount set forth in the said certificate of the State Board of Finance, and, concurrently therewith, and by appropriate entry, to reduce, by the same amount, the total principal amount of the said Certificates of Indebtedness then held in the Securities Account, and the State Treasurer shall forthwith take appropriate action to satisfy the principal amount of the Certificates to the extent of such reduction. Provided, however, in no instance shall such concurrently made reductions exceed the principal amount of certificates of indebtedness theretofore amortized."

[6] This amendment likewise reserves to the people the power of the initiative and referendum.

to either of the others, except in the instances hereinafter expressly directed or permitted.''

Appellant contends that Act 65 delegates too much power to the State Board of Finance, specifically, that the Board is given too much discretion in determining whether to buy, or not buy, the certificates, and in deciding what amount of certificates should be purchased. Reference is made to Section 5, which empowers the said Board to purchase certificates ''of a total principal amount not exceeding eight million, five hundred seventy-four thousand dollars ($8,574,000.00).'' Here again, the argument advanced by appellant has previously been rejected by this Court. In *Andres* v. *First Arkansas Development Finance Corporation, supra,* we approved the granting of authority to the State Board of Finance, as provided in Section 19 of Act 567 of 1957, to ''in it(s) discretion, purchase, at a price not to exceed par and accrued interest, bonds of any development finance corporation organized under the provisions of this Act to the extent of Five Million Dollars ($5,000,000) ; * * *.'' Likewise, in *Halbert* v. *Helena-West Helena Industrial Development Corporation, supra,* authority was given to the Board of Finance to purchase ''in its discretion'' up to 50% of the principal amount of bonds issued by a local development corporation. The Court said:

''Whether the State Board of Finance invests the State's surplus in one kind of bond or another is a matter for the Legislature to permit, and for the State Board of Finance to then decide in the exercise of its discretion.''

In *Ward* v. *Bailey, supra,* legislative authority which had been given to the State Investment Board to invest in an amount not to exceed 50% of the average state fund balances for the preceding two years, limited, however, to the investment of $4,000,000, was upheld. In the case before us, the maturity date for the certificates and the rate of interest are set forth in Section 6 of the Act. The total amount that may be issued is specified in Section 5, and the source of payment is clearly set forth,

and limited. We have concluded that appellant's conten-ion is without merit.

It follows that the Chancery Court did not err in dismissing appellant's complaint, and the decree is, in all things, affirmed.

McFADDIN, J., concurs.

ED. F. McFADDIN, Associate Justice, concurring. For a long time it has been recognized in this State that there is a great need for additional buildings and equip-ment at the University of Arkansas and the other State supported schools. The 1961 General Assembly made a step in the direction of meeting such needs by the passage of Act No. 442 of 1961; but that Act was declared uncon-stitutional in the case of *Cottrell* v. *Faubus* on June 5, 1961, 233 Ark. 721, 347 S. W. 2d 52. As a direct result of that decision, the Legislature was called into special ses-sion in August 1961, and undertook to find ways to take care of some of the building needs of the University and the other State supported schools.

Several acts were passed to make money available out of one of the cushion funds set up under the Revenue Stabilization Law; and then in Act No. 65 of the First Special Session[1] of 1961 (which is the Act here before us) the Legislature undertook to set up a commission to provide money for an additional cushion fund. The ques-tion now before us is the validity of this Act No. 65 which creates the State Reserve Fund Commission and authorizes it to issue certificates up to the total amount of $8,574,000.00, which certificates will be due on or before fifteen years and will bear interest at three per cent per annum.

The point that gave me the greatest concern in this case was the negotiability of these certificates, because the Act No. 65 provides in § 6: "The certificates shall have all of the qualities of negotiable instruments under the negotiable instrument laws of this State." I envis-aged: that the State Reserve Fund Commission would

---

[1] This Act may be found in § 13-327 *et seq.* of Ark. Stats.

sell the certificates to the State Board of Finance (under § 10 of this Act No. 65); that if the State Board of Finance so desired, it could sell the said certificates by proceeding under § 13-406 Ark. Stats.; that the certificates of the State Reserve Fund Commission would be on the general market; and that if a default occur then the State's credit or at least its good name would be hurt. We had such a horrible occurrence in the Road Improvement District Bonds, and also in the Depression of 1932. "A burned child fears the fire"; and I wanted to make sure that a similar situation did not occur again.

However, after much serious study, I have reached the conclusion that my fears can be remedied only by the Legislature and not by the courts. I find nothing in the Constitution that prohibits the Legislature from setting up a commission like the one here, which can issue certificates like these. Such procedure was directly approved in *McArthur* v. *Smallwood*, 225 Ark. 328, 281 S. W. 2d 428. If the said certificates issued under the Act No. 65 reach the hands of holders for value before maturity, and if there should be a default: it "just occurs." As we said in *Gipson* v. *Ingram*, 215 Ark. 812, 223 S. W. 2d 959:

"In determining the answer to the posed question, we emphasize that the Legislature, as the supreme lawmaking body, possesses all legislative powers except those expressly or impliedly prohibited by the Constitution. *State* v. *Ashley*, 1 Ark. 513; *Straub* v. *Gordon*, 27 Ark. 625; *Bush* v. *Martineau*, 174 Ark. 214, 295 S. W. 9. So we examine the Constitution to see if the Legislature is prohibited from allowing the state agencies and institutions to have and disburse cash funds."

In short, I find nothing in the Constitution that prohibits the Legislature from doing what it has done in said Act No. 65. *Gipson* v. *Ingram, supra,* and *McArthur* v. *Smallwood, supra,* point to such a result. Of course, any purchaser of these certificates from the State Board of Finance knows that these certificates are not State

obligations and that only a specific fund[2] is pledged to the payment of these certificates, and such purchaser would take with his eyes open. Because of all this, I concur in the conclusion that the Act No. 65 is not unconstitutional.

---

[2] The new Uniform Commercial Code of Arkansas, as found in § 85-3-105 Ark. Stats., says: "A promise or order otherwise unconditional is not made conditional by the fact that the instrument . . . (g) is limited to payment out of a particular fund or the proceeds of a particular source if the instrument is issued by a government or governmental agency or unit." The same section further says: "A promise or order is not unconditional if the instrument . . . (b) states that it is to be paid only out of a particular fund or source except as provided in this section." The interplay of these provisions is not now before us.