FORT SMITH v. ROBERTS.

Opinion delivered July 2, 1928.

822

*D. L. Ford* and *Pryor, Miles & Pryor,* for appellant.
*Warner, Hardin & Warner* and *Wallace Bourland,* for appellee.

SMITH, J. Special act No. 629, passed at the regular 1919 session of the General Assembly (Special Acts 1919, page 870), is an act entitled "An act to consolidate the health and sanitary offices in the Fort Smith District of Sebastian County, to abolish existing offices, to create a district board of health therein, and give it jurisdiction to select certain officers and to superintend their duties, to provide for the expenses incurred in such service, and for other purposes."

The preamble of the act recites that the Fort Smith and Greenwood districts of Sebastian County have separate fiscal systems as distinct as two counties, and that the city of Fort Smith embraces seventy-five per cent. of the area of the Fort Smith district and over ninety per cent. of the population and of the assessed valuation of

said district, and that the city of Fort Smith is governed by a commission form of government, and that for these reasons the general laws of the State providing for the county health officers and city health officers result in an overlapping of duties and a confusion of jurisdiction, and that a local bill is therefore necessary to make effective the objects and purposes of act 96 of the 1913 General Assembly and other acts upon the subject of the protection of the public health, and act No. 13 of the Acts of 1913, page 48. Act No. 96 is an act creating a State Board of Health and prescribing its duties, while act No. 13 is the act providing Fort Smith with a commission form of government.

After the preamble set out above, the act of 1919 provides as follows: The county judge of the county, commissioner No. 1 of the city of Fort Smith, and a graduate physician elected by the county judge and the commissioner, are empowered to promulgate such rules and regulations, not in conflict with the rules and regulations of the State Board of Health, as may be deemed necessary to protect the public health in said district. The act abolished the county health officer provided by act No. 96 of the Acts of 1913 in so far as it applied to the Fort Smith district of Sebastian County, and also abolished the office of city health officer of the city of Fort Smith, and the office of city physician. In the place of the offices abolished, the Fort Smith District Board of Health was created, and given the power to appoint a district health officer, who should be subject to the orders of the district board of health and the State Board of Health. Various duties were imposed on the district board of health, which need not be recited, but the board was expressly given the right of supervision of all dairies, meat and grocery stores, etc., as to their sanitary condition.

The board of health of the Fort Smith district duly organized pursuant to act 629 of the Acts of 1919, and, among other actions taken by the board, was to provide for slaughtering animals for human consumption at an

abattoir to be erected in the suburbs of Fort Smith, and a graduate veterinarian was appointed to supervise its operation. In aid of the regulations of the board of health, the commissioners of Fort Smith passed an ordinance prescribing the fees which should be charged butchers for the use of the abattoir and the fines which should be imposed upon butchers who slaughtered animals in violation of the rules and regulations of the district board of health. The ordinance of the city provided various regulations in regard to the operation of the abattoir which were supposed to be conducive to sanitation in slaughtering animals. The city ordinance also provided that any citizen might erect an abattoir under plans and specifications to be approved by the district board of health, in accordance with the rules of the board of health and the city ordinance.

An abattoir was erected and paid for in the proportions provided by act 629 of the Acts of 1919, and, after it had been in operation something over two years, appellees, who had been patrons of the abattoir during that time, brought this suit to test the constitutionality of the act under which the abattoir had been erected and operated. They also alleged that the abattoir was being operated in an unreasonable and arbitrary manner, and that excessive fees were being charged for the services rendered. The plaintiffs prayed that the act of 1919 and the ordinance of the city and the rules and regulations of the district board of health passed in furtherance thereof be declared unconstitutional, and that the continued operation of the abattoir be enjoined, and that the city be enjoined from prosecuting plaintiffs or other persons for violations of the city ordinance and the rules and regulations of the board of health.

The court, with the consent of the parties, appointed a master to hear testimony and to report upon the operation of the abattoir, and, in this connection, an expert accountant was appointed by the master, who made an extended investigation of the revenues and expenditures of the abattoir and detailed report thereof. The report

of the accountant showed that the abattoir operated from January 1, 1925, to January 1, 1926, at a profit to the city and county of $264.82, while its operation from January 1, 1926, to April 1, 1927, was at a loss of $3,594.33, and there does not appear to be any question about the correctness of these figures, at least they are not shown to be incorrect. There may be some unnecessary or avoidable expense in the operation of the abattoir, but the master to whom the cause was first referred reported that there was not. This master further reported that the facilities furnished at the abattoir were reasonably sufficient for the purposes for which it was intended, although its facilities were not sufficient for all the butchers of the city to use it at the same time, but that an abattoir of that size would be impractical because of the great expense attached to its operation, but that the abattoir was kept open and in operation from 8 A. M. to 5 P. M. every week day, and that all butchers were thus afforded an opportunity to use its facilities.

The court set aside, on exceptions of the plaintiffs, the report of the accountant and that of the master, and proceeded to hear certain oral testimony, after which the cause was again referred to another master, whose report was later approved by the court. This last report appears, however, to have covered only the amounts paid by each of the plaintiffs since the establishment of the abattoir and the total amount charged against each of them, respectively, for services at the abattoir since the grant of a temporary restraining order by the court, and the number and kinds of animals slaughtered by each of the plaintiffs. The second master does not appear to have considered or to have made a report upon the cost of operating the abattoir.

The learned chancellor prepared an elaborate opinion in the case, in which he refused to hold unconstitutional the act of 1919 or the rules and regulations of the board of health or the ordinance of the city making these rules and regulations effective, but he did hold that

the fees charged at the abattoir are arbitrary and excessive, and are in the nature of a revenue, and are discriminatory against local butchers and stock raisers, and unduly favor packers whose meats are shipped into the city in interstate commerce, as these meats do not pass through the abattoir and are not subject to the fees charged local butchers who use the abattoir.

The first question presented is, of course, that of the constitutionality of act 629 of the Acts of 1919; and we concur in the opinion of the court below that the act is constitutional. The power of the Legislature to enact laws to protect the public health and to impower the cities and towns of the State to do likewise has always been recognized.

In the comparatively early case of *Waters* v. *Townsend*, 65 Ark. 613, 47 S. W. 1054, it was held that a city council may confer upon its board of health power to abate nuisances dangerous to public health, that power having been granted by an act of the General Assembly.

The leading case on the authority to regulate markets is the case known as the Slaughter-house Cases, reported in 16 Wallace 36, 21 U. S. (L. ed.) 394. In that case the Supreme Court of the United States upheld an act of the Legislature of Louisiana which granted to a corporation created by it the exclusive right for twenty-five years to have and maintain slaughter-houses, landings for cattle, and yards for inclosing cattle intended for sale or slaughter, within certain parishes of the State, including the city of New Orleans, and prohibiting all other persons from building, keeping or having slaughter-houses, landings for cattle, and yards for cattle intended for sale or slaughter within the defined limits, and requiring that all cattle and other animals intended for sale or slaughter in the district should be brought to the yards and slaughter-houses of the corporation, and authorizing the corporation to exact certain prescribed fees for the use of its wharves and for each animal landed, and certain prescribed fees for each animal slaughtered. It was held by the Supreme Court of the

United States that this grant of exclusive right or privilege, guarded by proper limitation of the prices to be charged and imposing the duty of providing ample conveniences, with permission to all owners of stock to land and of all butchers to slaughter at these places, was a police regulation for the health and comfort of the people, within the power of the State Legislature to pass.

The act here under review and the rules and regulations of the board of health and the ordinance of the city enforcing them are far less comprehensive in their scope than was the act of the General Assembly of the State of Louisiana which the Supreme Court of the United States upheld, and we all concur in the opinion of the chancery court that the act of the Legislature and the ordinance of the city making effective the rules and regulations of the board of health are not unconstitutional. *Trigg* v. *Dixon*, 96 Ark. 199, 131 S. W. 695; *Carpenter* v. *Little Rock*, 101 Ark. 238, 142 S. W. 162.

It is insisted, however, that the Legislature has not itself exercised this police power by appropriate legislation, but has delegated that function to an administrative board having no power to legislate; and this we conceive to be the real question in the case.

In the case of *State* v. *Martin and Line*, 134 Ark. 420, 204 S. W. 622, it was said that "it is a well-established rule of law that legislative bodies have no right to delegate the lawmaking power to executive officers or administrative boards, but it is settled in this State that the Legislature may delegate 'the power to determine some fact or state of things upon which the law makes or intends to make its own action depend'."

The case just quoted from involved the validity of a rule of the State Board of Health regarding the vaccination of children and the presentation of a certificate showing a successful vaccination as a condition precedent to enrollment as a pupil in the public schools of the State, and the rule was upheld as a valid exercise of the police power and as not being a delegation of legislative power to the board of health.

This case cited and approved the earlier case of *Davis* v. *State,* 126 Ark. 260, 190 S. W. 436. In the Davis case, act 86 of the Acts of 1915, page 338, was attacked as being unconstitutional, for the reason that it delegated legislative functions to the board of control of the Agricultural Experiment Station, in that it permitted the board of control "to promulgate necessary rules and regulations" to make effective the laws of the State in relation to cattle-tick eradication without prescribing a penalty for a violation of such rules and regulations. Pursuant to the authority of the act of 1915, the board of control promulgated various rules and regulations in regard to dipping cattle in tick-infested districts. It was conceded by counsel in that case that the Legislature had the right to delegate to the board the duty of promulgating rules. While the concession of counsel was not binding upon us, the legislation was upheld as a valid exercise of the police power.

In 12 R. C. L., page 1265, § 3 of the chapter on Health, it is said:

"The power granted to administrative boards of the nature of boards of health, to adopt rules, by-laws, and regulations reasonably adapted to carry out the purpose or object for which they are created, is generally held not to be a delegation of legislative authority in violation of the usual constitutional prohibition. Such a delegation generally comes within the rule that, while it is necessary that a law, when it comes from the law-making power, should be complete, still there are many matters relating to methods or details which may be, by the Legislature, referred to some designated ministerial officer or body, and that all such matters fall within the domain of the right of the Legislature to authorize an administrative board or body to adopt ordinances, rules, by-laws, or regulations in aid of the successful execution of some general statutory provision. But a statute authorizing a State board of health to make such regulations as in its judgment may be necessary for the protection of the people from dangerous contagious diseases,

and giving it power to designate what diseases are 'contagious' or 'dangerous' to the public health, has been held to be a delegation of legislative power not authorized by the Constitution.''

At § 11 of the same chapter it is said:

''Health regulations are of the utmost consequence to the general welfare, and, if they be reasonable, impartial, and not against the general policy of the State, they must be submitted to by individuals for the good of the public. The constitutional guaranties that no person shall be deprived of life, liberty, or property without due process of law, and that no State shall deny to any person within its jurisdiction the equal protection of the laws, were not intended to limit the subjects upon which the police power of a State may lawfully be exerted in this any more than in other connections. Nor does the contracts clause of the Federal Constitution prevent the adoption of health regulations. However, legislative authority in this field of the police power, the same as in any other, is fenced about on all sides by constitutional limitations. It cannot properly extend beyond such reasonable interferences as tend to preserve and promote the enjoyment, generally, of those inalienable rights with which all men are endowed, and to secure which governments are instituted. The Legislature may not, under the guise of police regulation, arbitrarily invade private property or personal rights. The test when such regulations are called in question is whether they have some relation to the public health or public welfare, and whether such is, in fact, the end sought to be attained. A regulation imposing a burden on interstate commerce may of course be an invasion of the province of the Federal Government; but when it has real relation to the suitable protection of the people of the State, and is reasonable in its requirements, it is not invalid because it may incidentally affect interstate commerce, provided it does not conflict with legislation enacted by Congress pursuant to its constitutional authority.''

The annotator, in the note to the text quoted, collected many cases supporting the text.

In the case of *Milwaukee* v. *Gross,* 21 Wis. 241, 91 Am. Dec. 472, there was involved a city ordinance establishing a slaughter-house and regulating its management, and declaring it unlawful to slaughter any animal within the corporate limits of the city except at the city slaughter-house, and it was held by the Supreme Court of Wisconsin that the ordinance was not so unreasonable as being in restraint off trade as to justify the court in holding it invalid. In the annotator's note to this case it was said by the annotator that the power to establish and regulate markets (a right which many decisions of this court have held was possessed by the cities and towns of the State) includes power to purchase a site and erect the necessary buildings and stalls upon it, and, when provided, to adopt such rules in regard to it and the business to be there transacted as may be deemed reasonable and just.

Of course, the regulations must be reasonable and just, and it is not permissible, under the guise of regulation, to exact such fees as would make the abattoir a necessary source of revenue to the city and county, although the fact that the abattoir was not operated at a loss would not make the city ordinance a revenue measure. Numerous decisions of this court have defined the difference between regulatory ordinances passed as revenue measures and those ordinances passed for purposes of regulation from which an incidental profit to the municipality is derived, a late case being that of *North Little Rock* v. *Kirk,* 173 Ark. 554, 292 S. W. 993. Those of the first class, which are enacted for the purpose of raising revenue, are invalid; those of the latter class, from which a profit may be incidentally derived, are valid.

We think the undisputed testimony shows that no profit is derived from the operation of the abattoir. This, however, is not the only test of the reasonableness off the regulations. The fees charged might not be a source of

revenue, and yet be so burdensome as to drive butchers using the abattoir out of business by depriving them of a reasonable profit in the operation of their business. We do not think that showing was made in this case. In the first place, the ordinance permits a butcher to erect his own abattoir upon plans approved by the district board of health.

It is essential that there be a place where animals may be butchered, and the nature of that business is such that its regulation is proper and necessary to protect the public health. All the cases on the subject so hold. The testimony shows that the charges first fixed by the city commission were unnecessarily high, and they were voluntarily reduced. The fees now charged are insufficient to pay operating costs, and the city and the Fort Smith District of the county are paying the deficit.

The fees now charged are as follows: Cattle, one year or older, 75 cents each; calves and cattle under one year, 35 cents each; hogs, 40 cents each; goats and sheep, 30 cents each. For this service charge there is furnished a superintendent and two helpers and a graduate veterinarian, with an inspection of the animals to be slaughtered both *ante* and *post mortem*. The abattoir consists of thirteen stockpens, chutes, two refrigerator boxes, an ice-machine, hooks, rollers, and other appliances necessary for handling carcasses, together with the necessary hot and cold water. The butchers are not required to clean the place after using it, as this work is done by the employees, whose wages are a part of the operating expense of the abattoir.

It is true that dealers in meats which are shipped into the city by the nonresident packers in interstate commerce avoid this expense which the local butchers bear, but we judicially know that such meats have been inspected under Federal laws, and the purpose of all the regulation by Federal, State or municipal authorities is to have the meats inspected so that it may be known that they are fit for human consumption.

It is argued that the testimony failed to show that any of the animals slaughtered at the abattoir have been rejected in either *ante mortem* or *post mortem* examinations, and that therefore the inspections are perfunctory and valueless. This does not follow. It is not to be assumed that the inspectors are not discharging their duties. It is more probable that, knowing there will be an inspection, no animals are brought to slaughter which are diseased.

The majority of the court have concluded that the testimony does not show that the fees charged are unreasonable, excessive, discriminatory, or arbitrary; that the legislation is not unconstitutional, and that the regulations of the district board of health are not unreasonable.

The decree of the court below must therefore be reversed, and it is so ordered, with directions to dismiss the complaint as being without equity.

MEHAFFY, J. I agree with the majority opinion that the law is constitutional, but in my opinion the act does not authorize the expenditure of money for the erection and maintenance of an abattoir. Mr. Chief Justice HART and Mr. Justice HUMPHREYS agree with me in these views.