CARPENTER v. McLEOD, COMPTROLLER.

4-6415                                      150 S. W. 2d 607

Opinion delivered April 28, 1941.

*Harvey G. Combs,* for appellant.

*P. A. Lasley,* for appellee.

GRIFFIN SMITH, C. J. Questions for determination are (1) whether act 133, approved March 13, 1941, was constitutionally passed by the house of representatives; (2) whether effect of the act is to authorize counties to issue interest-bearing evidences of indebtedness or the state to lend its credit to counties, in violation of art. 16, § 1, of the constitution, and whether amendment 10 is violated; (3) whether revenues of the state are pledged, in violation of amendment 20, and (4) whether vested rights arise within the meaning of amendment 7 which prohibits the declaration of an emergency in those instances where such rights are created.

Act 133 creates a "highway turnback fund control board," consisting of the county judge of each county, the treasurer of state, and the state comptroller. It is made the duty of the state comptroller to audit and file his report, showing outstanding warrants issued for payment by the several counties from the fund created by § 23 (e)[1] of act 11, approved February 12, 1934, as amended.[2]

The county judge of any county is authorized to stipulate in writing[3] the amount of turnback warrants "and the time or times of payment of the required amount or amounts out of the county apportionment of the highway turnback fund which, with an additional item for interest, will be sufficient to discharge a proportionate amount of securities to be issued [by the board, or separately by the county]; provided, that the maximum amount shall not be in excess of twenty-five per cent.

---

[1] "All net tax derived from motor vehicle fuel under the provisions of § (c) of this act shall be divided: Ninety-two point three per cent. (92.3%) shall be deemed state highway revenue, and seven point seven per cent. (7.7%) shall be deemed county highway improvement revenue, and shall be credited by the treasurer of state to the 'county highway fund'."

[2] For further information with reference to this fund, see *Ladd* v. *Stubblefield,* 195 Ark. 261, 111 S. W. 2d 555, and cases cited.

[3] The stipulation is to be filed at a meeting called by the state comptroller.

of the county's apportionment of such fund for any year. Said stipulation and agreement shall be filed with the state treasurer; and provided further, that the county judge of any county that shall so desire may execute and offer for sale under the provisions of this act, separately and apart from any other county and the highway turn-back control board, bonds to fund the outstanding warrants of said county as shall be determined under the provisions of this act as of March 1, 1941.''

Section 3 of act 133 provides for issuance of negotiable interest-bearing . bonds, notes, or debentures, ''. . . not exceeding the aggregate amount of stipulated and agreed principal amount of warrants of the various counties, [to] mature at such time or times [as may be fixed by resolutions of the board] not exceeding thirty years.''

The securities are payable, both as to principal and interest, from 25 per cent. of the 7.7 per cent. apportionment of county turnback money, ''. . . and it shall be plainly so stated on the face of . . . such securities as well as that same does not constitute the general or full faith and credit obligations or an indebtedness of either the state of Arkansas or of any of the counties.''

After the securities are issued it becomes the duty of the treasurer of state to set aside in a special fund 25 per cent. of the annual allotment of 7.7 per cent. turnback fund, ''. . . and said state treasurer shall withdraw from such special fund the amount necessary to pay the principal and interest of such securities as and when the same are scheduled to become due.''

Section five is a pledge that the state ''. . . will not permit the apportionment provided by law for any county, after the issuance of such securities, to be changed or the percentage of seven and seven-tenths allotted to the highway turnback fund in § 23 of said act 11 of 1934 to be reduced prior to the payment in full of all securities so issued.''

When the bonds, notes, or debentures are sold, money accruing therefrom is payable to the treasurer of state and by him disbursed to the interested counties. Remittances are to be made to county treasurers, who are

directed to keep the fund in a special account, to be paid out ". . . only for the retirement of the warrants covered by the stipulation and agreement as aforesaid of the county judge of such county."

Prior to March 3, 1937, county courts were permitted to incur obligations payable from the turnback fund, irrespective of whether money was available to meet warrants issued pursuant to such contracts. In some instances anticipated receipts had been drawn against for several years in advance. *Washington County* v. *Day*, 197 Ark. 1081, 126 S. W. 2d 602. See § 4 of act 193 of 1937. To remedy this evil the Fifty-first General Assembly passed act 193, approved March 3, 1937. It was construed in *Taylor* v. *J. A. Riggs Tractor Co.*, 197 Ark. 383, 122 S. W. 2d 608.

The Fifty-second General Assembly, acting, apparently, upon the assumption that act 193 of 1937 had been misconstrued, and that county judges had, in good faith, incurred obligations and allowed claims in excess of turnback funds apportionable for the year affected, "validated" such claims and warrants for 1937 and 1938. Act 299, approved March 14, 1939. See *Logan County* v. *Anderson, ante,* p. 244, 150 S. W. 2d 197.

It now develops that more than a million dollars in county turnback warrants issued in excess of revenues are outstanding.

The Fifty-third General Assembly had the power to reclassify the turnback fund, and the fact that act 133 of 1941 is in partial negation of acts 193 of 1937 and 299 of 1939 is unimportant. The fund, not being one within the orbit of amendment No. 10, may be dealt with by the state through legislative action; and, although the effect of acts 193 and 299 was to give to the turnback all of the attributes of a county fund for use as restricted by the gratuity, the control of 25 per cent. of 7.7 per cent. of net motor vehicle fuel taxes is, by act 133 of 1941, given to the state.[4]

---

[4] Act 299 does not refer to the contingent turnback fund provided by § 51 of act 11 of 1934. [During the 1940 calendar year net receipts from 7.7% of the tax on motor vehicle fuel were $843,206.56. Net receipts from one-fourth of a cent per gallon on gasoline for the same period were $448,060.60. Gross gasoline tax receipts were $11,311,637.33].

We do not discuss, in detail, the charge that act 133 of 1941 was not legally passed by the General Assembly. It is our view that the measure was constitutionally enacted.

It is insisted that art. 16, § 1, of the constitution is violated.[5]

Appellee's brief cites opinions of this court sustaining acts 131 and 132 of 1933 authorizing issuance of revenue bonds by cities for the construction of sewer and water systems. *Jernigan* v. *Harris,* 187 Ark. 705, 62 S. W. 2d 5. It was alleged that the acts authorized cities to lend their credit by issuing interest-bearing evidences of indebtedness. We held that the municipality, as such, did not incur obligations on account of the bonds, nor did it assume any responsibility for them. Payment, it was said, could not be made from taxes or other municipal revenue.[6] A later case is *Robinson* v. *The Incorporated Town of DeValls Bluff,* 197 Ark. 391, 122 S. W. 552.

In support of the contention that act 133 does not violate amendment No. 20 to the constitution,[7] attention is called to *Page* v. *Rodgers,* 199 Ark. 307, 134 S. W. 2d 573. In that case the legislature, by act 381 of 1937, directed that a portion of the turnback allotted to Saline county be applied in payment of bonds issued by Mablevale Extension Road Improvement District No. 5. In the opinion it is said: "It is undisputed that the district in question is a public enterprise, was completed and the bonds issued after February 4, 1927. It is, therefore,

[5] "Neither the state nor any city, county, town or other municipality in this state shall ever loan its credit for any purpose whatever; nor shall any county, city, town or municipality ever issue any interest-bearing evidences of indebtedness, except such bonds as may be authorized by law to provide for and secure the payment of the present existing indebtedness, and the state shall never issue any interest-bearing treasury warrants or scrip." [But see amendments Nos. 10, 13, and 17.]

[6] See *McCutcheon* v. *Siloam Springs,* 165 Ark. 846, 49 S. W. 2d 1037; *Snodgrass* v. *Pocahontas,* 189 Ark. 319, 75 S. W. 2d 223.

[7] "Except for the purpose of refunding the existing outstanding indebtedness of the state and for assuming and refunding valid outstanding road improvement district bonds, the state of Arkansas shall issue no bonds or other evidence of indebtedness pledging the faith and credit of the state or any of its revenues for any purpose whatsoever, except by and with the consent of the majority of the qualified electors of the state voting on the question at a general election or at a special election called for that purpose."

entitled to share in the county turnback fund, for the state may bestow its bounty where it will."

This expression appears in the opinion: "The only limitation provided [by amendment No. 20] is that the state shall issue no bonds or other evidences of indebtedness pledging the faith and credit of the state or any of its revenues for any purpose. No limitation is placed upon the paying out of the revenue of the state, but the limitation is placed upon the issuance of bonds pledging the faith, credit and revenues of the state."

If it be conceded that, in a technical sense, the securities are not state of Arkansas bonds because, by the act, and by printed, engraved, or lithographed indorsement full faith and credit of the state are expressly withheld and affirmative notice is given that they do not create a debt against the state or any of the counties, we are still confronted with the *fact* of issuance under authority of the state, by an agency created for that purpose, and the state enters into solemn covenants (1) that it will not permit the turnback apportionment to be changed; nor (2) allow a reduction of the 7.7 per cent.

It is our view that when the state contrived to segregate 25 per cent. of the fund in question, and by using this as a guarantee covenants with money lenders that the securities will be paid with funds withheld from the counties, the state, in fact, is the moving agency. But for its guarantee to maintain the fund and to control its application, bonds could not be sold. So, in effect, if not in words, the state borrows money and pledges its revenues.

It is true that § 23 (e) of act 11 of 1934 is a pledge, subject to certain provisos, that the allotment of 7.7 per cent. to counties will not be reduced. But, in respect of a gratuity by the state to its political subdivisions, the power of rescission is not prohibited by the constitution.

Conceding that (in respect of some of the counties) appreciable public value would attend the funding of turnback warrants, this showing of merit does not alter the legal status of the transaction. We very reluctantly,

therefore, hold that § 5 of act 133 is in conflict with amendment No. 20 to the constitution.

Reversed.