McArthur *v.* Smallwood.

5-764                                 281 S. W. 2d 428

Opinion delivered July 27, 1955.

*Williams & Gardner,* for appellant.

*Tom Gentry,* Attorney General, and *Mehaffy, Smith & Williams,* for appellee.

NED A. STEWART, Special Chief Justice. The appellant and plaintiff below, Wood McArthur (hereinafter referred to as appellant,) proceeding as a taxpayer, filed this case in the Chancery Court of Pulaski County, Arkansas against the appellees and defendants below, J. M. Smallwood, C. G. Hall, J. V. Satterfield, Jr., Harry W. Parkin and J. L. Shaver (hereinafter referred to as appellees), as members of the Arkansas Justice Building Commission, seeking to have Act 375

of 1955 declared unconstitutional and void and in violation of certain constitutional rights of the plaintiff and other taxpayers similarly situated, and seeking to enjoin the appellees from complying with, or in any manner carrying out, the provisions of the Act. The appellees waived service of summons, entered their appearance, and filed a demurrer to the complaint which was sustained by the Pulaski Chancery Court, and after appellant declined to plead further, that Court entered a decree dismissing the complaint.

The appellant duly perfected an appeal to this Court. Thereafter the regular Court disqualified itself and a Special Court (composed of the writer, J. G. Burke, Harry P. Daily, Surrey E. Gilliam, Harry L. Ponder, John Mac Smith and Edward L. Wright) was appointed to decide the case. In the public interest, this Special Court entered an order granting permission to any interested party in the State to file a brief with the Court covering any issue the party desired to raise concerning Act 375 of 1955. These briefs were to be filed by July 11, but none have been forthcoming, and the Court has proceeded to determine the appeal upon the record and briefs filed in Case No. 5-764 and upon its own investigation of the law.

Act 375 of 1955 creates the Arkansas Justice Building Commission and authorizes the Commission to construct a Justice Building on the capitol grounds in Little Rock, Arkansas, and to finance the construction by the issuance of bonds to be payable from and secured solely by a pledge of the funds in the Justice Building Fund, established by the Act. The funds therein will be derived from the rental of space in the building to the Workmen's Compensation Commission, the Public Service Commission, and such other persons or agencies as may occupy space therein; from moneys received from various county treasurers from additional costs taxed by the Act; from appropriations on a current basis; and from gifts, bequests, donations or other sources. Authorization is granted for lease agreements between the Commission and the Workmen's Compensation Com-

mission and the Public Service Commission, and provision is made for the payment of rentals thereunder from the Workmen's Compensation Commission funds and Public Service Commission funds directly to the Commission without said funds first going into the state treasury. The funds derived from the additional costs taxed by the Act are also paid directly to the Commission and do not go into the state treasury. The bonds to be issued by the Commission shall be general obligations of the Commission only and shall in no event constitute an indebtedness for which the faith and credit of the State of Arkansas, or any of its revenues, are pledged. Appellant makes several attacks upon the constitutionality of the Act which will be hereinafter considered in order.

## Delegation of Legislative Power

It is alleged that there is a delegation of legislative power to the Commission contrary to and in violation of Article 5, Section 1, as amended by Amendment No. 7, and Article 4, Sections 1 and 2, of the Constitution of the State of Arkansas. It is well settled that legislative bodies have no right to delegate the lawmaking power to commissions and boards established by the legislature, but it is equally well settled that the legislature may delegate the power to determine facts upon which the law makes or intends to make its own action depend and that general provisions may be set forth with power given to those who are to act under such general provisions to complete the details. See, among other cases, *Fort Smith* v. *Roberts,* 177 Ark. 821, 9 S. W. 2d 75; *Fulkerson* v. *Refunding Board of Arkansas,* 201 Ark. 957, 147 S. W. 2d 980; *Currin* v. *Wallace,* 306 U. S. 1, 59 S. Ct. 379, 83 L. Ed. 441. We have carefully examined Act 375 and find no unconstitutional delegation of legislative power. The Act is complete in itself and when placed into operation the objects accomplished necessarily will be those provided for and intended by the Legislature. The Commission will do no more than find the necessary facts, complete the necessary details, and exercise a discretion, within clearly defined limits, as to

the execution of the Act. We have considered the various grounds urged by the appellant as constituting an unlawful delegation of the legislative power and find them to be without merit.

### Payment of Rent by the Workmen's Compensation Commission and Public Service Commission and Payment of the Proceeds of the Costs Levied Directly to the Commission.

The Act provides that the rental payments under the lease authorized to be executed between the Workmen's Compensation Commission and the Commission shall be paid directly from Workmen's Compensation Commission funds to the Commission prior to the deposit of any of said moneys in the Workmen's Compensation Fund in the state treasury. And, the Act authorizes the sale of the present Workmen's Compensation Commission building and the deposit of the funds derived therefrom directly with the Commission to be applied to the rental payments in the manner provided in the Act. The Act contains a similar provision with reference to the rental payments by the Public Service Commission in that said payments are to be made from Public Service Commission funds prior to the payment of any of said funds into the state treasury. And, the costs collected pursuant to the provisions of the Act are also to be forwarded by the various county treasurers directly to the Commission, and none of the costs go into the state treasury. The appellant contends that these provisions of the Act are contrary to Article 5, Section 29 and Article 16, Section 12 of the Constitution of the State of Arkansas. In addition, appellant cites certain cases such as *Moore* v. *Alexander,* 85 Ark. 171, 107 S. W. 395; *Jobe* v. *Caldwell,* 99 Ark. 20, 136 S. W. 966; *Dickinson, Auditor* v. *Clibourn,* 125 Ark. 101, 187 S. W. 909; and others, for the propositions that one legislature cannot bind future legislatures concerning the expenditure of public funds by making continuing appropriations, that the life of an appropriation is two years, and that appropriations must state distinctly the maximum amount to be drawn in dollars and cents, and the pur-

pose for the authorized expenditure. These cases do not reach the issue raised since they deal with money in the state treasury and it appears to be well settled that such moneys must be disbursed by specific appropriations of not to exceed two years in duration. The real issue is whether these funds must be paid into the state treasury. If there is no such constitutional requirement, then there is no violation of the provisions relied upon by appellant and no conflict with the law of the above cited cases. This Court has held, *Gipson* v. *Ingram,* 215 Ark. 812, 223 S. W. 2d 595, that there are certain public moneys, designated in that case ''cash funds,'' which may be controlled by the Legislature and in accordance with legislative directive need not be paid into the state treasury and need not be specifically appropriated. Appellant concedes that if the funds involved herein are ''cash funds'' within the *Gipson* v. *Ingram* case, supra, that decision is controlling. The Court in the *Gipson* v. *Ingram* decision, supra, defined ''cash funds'' as follows (pages 816 and 817 of 215 Ark.):

''So, for purposes of this topic 'cash funds' are those received by the state agencies and institutions from sources other than taxes, as that term 'taxes' is ordinarily used.''

Appellant would distinguish the *Gipson* v. *Ingram* decision, supra, on the ground that the moneys involved herein are derived from ''taxes'' as that term is ordinarily used.

The Legislature has clearly designated the funds involved as ''cash funds'' and we find no express constitutional restriction upon the supreme power of the Legislature to deal with public revenues of any type prior to the time such revenues are placed in the state treasury. Therefore, since the Constitution is a restriction upon the otherwise supreme power of the Legislature rather than a grant of power to the Legislature, there would appear to be no sound constitutional reason for nullifying the express legislative action in this particu-

lar. Furthermore, these funds clearly qualify as moneys received from sources other than taxes, as that term is ordinarily used.

The Workmen's Compensation Act establishes a special fund in the state treasury known as the Workmen's Compensation fund and into that fund the various premium taxes and fees provided for by the Act are deposited. Original qualification fees are charged insurance carriers at the time of securing the first license to transact business and self-insurers at the time of qualifying as such, which fees are paid directly to the Workmen's Compensation Commission. A premium tax in an amount calculated on the basis of the administration cost of the Act, but not to exceed 3% on all premiums received, is levied against each participating insurance carrier, and these fees are collected by the Insurance Commissioner. The Commission collects directly a comparable tax on self-insurers. Thus, it is seen that the Workmen's Compensation Commission funds are collected from insurance carriers, who, by choice, participate in the writing of compensation, and from self-insurers, on the basis of financing the administration of the Act, and are segregated as a trust fund in the state treasury. These funds are collected and must be used for Workmen's Compensation purposes and are not available for the general or other purposes of the State of Arkansas. The leasing of adequate facilities peculiarly designed for the functions of the Workmen's Compensation Commission is obviously a proper part of the administration of the Compensation Act and a proper use of the funds collected therefor.

The cost of the operation of the Public Service Commission is financed by fees levied and charged against rail carriers, other carriers and utilities, and the amount of the fees collected is governed by the cost of the operation of the Public Service Commission. On receipt of the fees and charges provided for, the Secretary of the Public Service Commission pays the same into the state treasury and the amount so received by the treasurer is credited by him to the Public Service Commission

fund therein. The deposits so made replace money appropriated out of the treasury for the operation of the Public Service Commission, and whether or not there is in the strict sense of the word a trust fund, the result is the same because the Public Service Commission funds are neither collected for nor used by the State for the general purposes or any other purpose thereof. The leasing of adequate facilities for the functioning of the Public Service Commission is clearly a proper element of its operation and a proper use of the funds collected therefor.

The funds that will be realized from the additional costs levied by the Act fall in the same category. They will be paid by those securing the services of our courts and, as in the case of other costs, are designed to help finance the services received. It seems too apparent for comment to observe that the proper housing of the Supreme Court, the Clerk, the Library and the Attorney General is essential to the administration of justice. Also, these funds are not and will not be available for the general or other purposes of the State.

The funds involved, being special funds restricted in their use, are clearly moneys received from sources other than taxes, as that term is ordinarily used. Therefore, in our opinion, the *Gipson* v. *Ingram* decision, supra, is controlling and the legislative treatment of the funds involved is neither contrary to nor in violation of the Constitution of the State of Arkansas. This conclusion is entirely consistent with that reached by courts of other jurisdictions. See *Ziegler, State Highway Commissioner* v. *Witherspoon, City Controller,* 331 Mich. 337, 49 N. W. 2d 318; *State ex rel. Fatzer, Atty. Gen.* v. *Kansas Armory Board, et al.,* 174 Kan. 369, 256 P. 2d 143; *State* v. *Florida State Improvement Commission,* 158 Fla. 743, 30 So. 2d 97. In the last cited case, there was pledged to the payment of revenue certificates issued to finance the construction of an office building, among other things, funds collected by statute for the administration of the Workmen's Compensation Division of the Florida Industrial Commission. It was argued that this

pledge amounted to the pledging of a state tax for the payment of rentals. Concerning such use of the Workmen's Compensation fund, the court states (page 99 of 30 So. 2d):

"Here we have a clear declaration that these funds are not the property of the state but that they shall be administered by the Commission, the State Treasurer being the mere custodian of them for that purpose. They are trust funds held in like category as funds held and administered by the Board of Commissioners of Everglades Drainage District in the drainage of the Everglades. *Lainhart* v. *Catts,* 73 Fla. 735, 75 So. 47. These funds never reach the state treasury as state funds; are never available for the general purposes of the state, but are solely for the use of the Florida Industrial Commission. They are similar to funds allocated to the Florida Improvement Commission that were discussed in *State ex rel. Watson* v. *Caldwell,* supra. Under such a state of facts we can conceive of no theory by which these funds could be called state funds, and thereby immunized by Section 6, Article IX of the Constitution, from use in servicing the revenue certificates."

*The Financing of the Building, Including the Execution of Leases and the Issuance of Bonds.*

As previously pointed out, the Act authorizes the Commission to issue bonds to be payable from and secured solely by a pledge of the funds in the Justice Building Fund, and the Act expressly provides that the bonds shall be general obligations only of the Commission and in no event shall they constitute an indebtedness for which the faith and credit of the State, or any of its revenues, are pledged. Appellant challenges the provisions of the Act pertaining to the financing of the Justice Building as being in violation of Article 16, Section 1 as amended by Amendment No. 13, and Amendment No. 20. Article 16, Section 1 of the Constitution prohibits the state from lending its credit and from issuing any interest bearing treasury warrants or scrip. By the express language of Act 375, the credit of the State of Arkansas is not involved and this Court has held that

Article 16, Section 1 did not even prohibit the State from issuing bonds. In *Brown* v. *The Arkansas Centennial Commission*, 194 Ark. 479, 107 S. W. 2d 537, this Court stated (page 482 of 194 Ark.):

"It is plainly manifest from this language that the bonds to be issued are not obligations of the State, but 'shall be solely and exclusively the obligations of the Commission in its corporate and representative capacity.' This language is too plain to be misunderstood and is not open to construction. So the State is not lending its credit and it is not issuing any interest-bearing treasury warrants or scrip, and the provisions of said section of the Constitution are not invaded. *State Military Note Board* v. *Casey*, 185 Ark. 271, 47 S. W. 2d 23. Even where the State issued its own bonds to borrow money for its own uses and purposes we held there was no violation of this provision of the Constitution. *Bush* v. *Martineau*, 174 Ark. 214, 295 S. W. 9; *Connor* v. *Blackwood*, 176 Ark. 139, 2 S. W. 2d 44; *Tapley* v. *Futrell*, 187 Ark. 844, 62 S. W. 2d 32; *Sparling* v. *Refunding Board*, 189 Ark. 189, 71 S. W. 2d 182."

The pertinent provisions of Amendment No. 20 are that "the State of Arkansas shall issue no bonds or other evidence of indebtedness pledging the faith and credit of the State or any of its revenues for any purpose whatever, except by and with the consent of the majority of the qualified electors of the State." The Arkansas Justice Building Commission, although a public agency, is created as an entity with specified authority and powers and for purposes of Amendment No. 20, the Commission, in our opinion, is not the State of Arkansas. In similar situations this Court has authorized public agencies to issue bonds pledging for their payment revenues available to the particular agency and has rejected challenges of unconstitutionality under Amendment No. 20.

In *Davis* v. *Phipps*, 191 Ark. 298, 85 S. W. 2d 1020, 100 A. L. R. 1110, bonds were to be issued by the State Board of Education under Act No. 333 of 1935, which authorized the issuance of bonds to be secured by school district bonds which had been delivered to the State

Board of Education as security for loans from the revolving fund. The court stated, page 303:

"But, aside from further speculation, we may say that Amendment No. 20 prohibits bonds or instruments issued by the State itself for the security of which is pledged the State's faith and credit. A bond is a written promise to pay money, and we have said, in the foregoing discussion, that the State is not issuing these bonds, and it would not be bound for their payment. Therefore these bonds, which the State Board of Education is about to issue, are not within the prohibited class."

And on page 304:

"Finally, it may be suggested that the pledges contemplated by the State Board of Education are not within the forbidden class for another reason; that is, under Amendment No. 20 it would seem that pledges of revenue are forbidden only when such pledges are to secure State bonds. This seems to be in accordance with the language of Amendment No. 20."

In *Jacobs* v. *Sharp*, 211 Ark. 865, 202 S. W. 2d 964, there was involved Act No. 62 of 1947, which authorized the issuance of bonds by state institutions to finance buildings, the bonds to be obligations of the Board of Trustees of the particular institution only and not obligations of the State. The bonds were to be payable from revenues of the institutions, such as dormitory rental charges. The court upheld the validity of the Act and on page 870 of 211 Ark. stated:

"Therefore, it appears to us to be certain that the bonds to be issued by the Board of Trustees are not State bonds and that the faith and credit of the State are not pledged. Not being the obligations of the State of Arkansas, Amendment No. 20 has no application to them and is not violated because the prohibition therein relates only to State bonds."

The moneys pledged to the payment of the bonds in the *Jacobs* v. *Sharp* decision, supra, were admittedly

public revenues. Therefore, it seems to be well established by the decisions of this Court that the pledging of so-called state or public revenues is not prohibited by Amendment No. 20 unless the pledge is to the payment of State of Arkansas bonds. Thus, the real inquiry is whether the bonds that will be issued by the Commission, for purposes of Amendment No. 20, must be classified as State of Arkansas bonds regardless of the express provision in the Act that they are not. And, in making this inquiry, the Court must look to the substance of the transaction. *Carpenter* v. *McLeod, Comptroller,* 202 Ark. 359, 150 S. W. 2d 607; *State ex rel. Attorney General* v. *State Board of Education,* 195 Ark. 222, 112 S. W. 2d 18.

To properly determine the matter, it is necessary to analyze the funds that will be pledged to the obligations of the Commission. The Justice Building Fund is established as a trust fund by Section 15 of the Act. Subsection (a) of Section 15 covers the moneys that will be received from the various county treasurers from the additional costs taxed by Section 14 of the Act. Section 14 expressly provides that the costs will be collected only in the event the Legislature does not make an annual appropriation of at least $28,000 to the Justice Building Fund for the payment of rent for space occupied by the Supreme Court, the Clerk of the Supreme Court, the Supreme Court Library, and the Attorney General. There is no obligation on the Legislature to make this appropriation and there is no attempt to bind future legislatures in this particular. The appropriations, being current in nature, present no constitutional problem because they will simply amount to a bestowing by the Legislature of its bounty, and in this regard it is supreme. *Cone* v. *Hope-Fulton-Emmett Road Improvement District,* 169 Ark. 1032, 277 S. W. 544; *Grable* v. *Blackwood,* 180 Ark. 311, 22 S. W. 2d 41; *Page, State Treasurer* v. *Rodgers, Trustee,* 199 Ark. 307, 134 S. W. 2d 573; *Clayton, State Treasurer* v. *City of Little Rock,* 211 Ark. 893, 204 S. W. 2d 145. Furthermore, there is no constitutional objection to the making by one legislature of a continuing levy. *Moore* v. *Alexander,* 85 Ark. 171, 107

S. W. 2d 395. The only other consideration necessary in the determination of whether there are sufficient obligations on the part of the State of Arkansas with reference to the additional costs levied to constitute this a State of Arkansas bond is whether the levy is irrevocable. There is no such express provision in the Act, but it does appear to be established under the decisions of this Court that the law in effect at the time of the making of a contract becomes a part of it, as if expressly referred to and incorporated in its terms. See *Adams* v. *Spillyards*, 187 Ark. 641, 61 S. W. 2d 686, 86 A. L. R. 1493; *Hospelhorn, Receiver* v. *Burke*, 196 Ark. 1028, 120 S. W. 2d 705; *City of Little Rock* v. *Community Chest of Greater Little Rock*, 204 Ark. 562, 163 S. W. 2d 522, 142 A. L. R. 1072; *Liebe* v. *Sovereign Camp Woodmen of the World*, 205 Ark. 540, 170 S. W. 2d 370; *Gulf Insurance Company* v. *Holland Construction Co.*, 218 Ark. 405, 236 S. W. 2d 1003. And, see the Michigan case of *Ziegler* v. *Witherspoon*, supra, wherein the court stated on page 327 of 49 N. W. 2d:

"It is not disputed that when the bonds are issued a contract will be made between the bondholders and the issuing authorities, and that the contract will include the provisions of all relevant existing laws. 'It is also settled that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to and incorporated in its terms.' *Von Hoffman* v. *City of Quincy*, 4 Wall. 535, 71 U. S. 535, 18 L. Ed. 403. See *Hammond* v. *Place*, 116 Mich. 628, 74 N. W. 1002; *City of Pontiac* v. *Simonton*, 271 Mich. 647; 261 N. W. 103. Thus the contract will include those acts which authorize the collection of taxes for the State highway fund."

Therefore, when bonds are issued by the Commission, the bondholders may well acquire contractual rights with reference to this and other provisions of Act 375 so that an attempt by a subsequent Legislature to abrogate or alter such provisions in such a manner as to impair the security of the bondholders would constitute

an impairment of their contractual rights. Even so, in our opinion, there would be no violation of Amendment No. 20. The levy of additional costs creates a special fund in every sense of the word and the funds never reach the state treasury. An irrevocable levy of this nature places no obligation upon any funds of the State which have heretofore been or which would otherwise be available for the general or other purposes of the State. The bondholders can look only to those sources of revenue made available by the Act, and if they are insufficient, no claim of any nature can be asserted against the State. We have carefully considered the *Carpenter* v. *McLeod, Comptroller,* supra, and *State ex rel. Atty. General* v. *State Board of Education,* supra, decisions, and have concluded that they are distinguishable. Those decisions were dealing with funds in the state treasury and one legislature was attempting to bind another as to the disposition of state treasury funds. This is not true in the instant case and we have heretofore pointed out the supreme power of the Legislature to deal with these funds without the necessity of future legislative action. Furthermore, our conclusion is consistent with what we believe to be the correct interpretation of Amendment No. 20, as set out in the *Davis* v. *Phipps,* supra, and *Jacobs* v. *Sharp,* supra, decisions — that is, the irrevocable pledging of state funds is condemned only when they are pledged to full faith and credit obligations of the State. There was necessarily an irrevocable pledging of public revenues in the *Jacobs* v. *Sharp* decision, supra, but, as is the case here, the pledge was not of state-treasury funds, and, therefore, the bonds were not in fact State of Arkansas obligations. Our research reflects that this is the view taken by a substantial majority of courts of other jurisdictions.

The case of *State of New Mexico ex rel. Capitol Addition Building Commission* v. *James J. Connelly, State Treasurer,* 39 N. M. 312, 46 P. 2d 1097, 100 A. L. R. 878, is peculiarly in point from the standpoint of the additional costs levied by Section 14 of the Act. That case involved an Act of the New Mexico Legislature creating the Capitol Addition Commission and authorizing

the issuance of debentures secured by an irrevocable pledge of the proceeds of a $2.50 levy upon each and every civil action filed in the offices of the clerks of the various district courts. Concerning the point immediately involved, the court stated:

"And so we conclude that the debentures in question, neither requiring nor warranting a resort to the general taxing power of the State for their retirement, but payable instead from proceeds of an imposition in the nature of an excise laid upon all civil actions, filed with the various district clerks of the state, in addition to the regular docket fee, to be converged into a special fund in the hands of the state treasurer, will not constitute a general obligation on the part of the State. Hence, they are not within the interdiction of article 9, Sec. 8. of the State Constitution."

See the following New Mexico cases handed down subsequently in which that court adheres to the special fund doctrine: *State Office Building Commission* v. *Trujillo,* 46 N. M. 29, 120 P. 2d 434; *Stone* v. *City of Hobbs, et al.,* 54 N. M. 237, 220 P. 2d 704.

In *Ziegler* v. *Witherspoon,* supra, there was a pledge of the income received from motor vehicle taxes — a special tax not available for the general purposes of the state. On page 326 of 49 N. W. 2d, the court stated:

"For these reasons we find that the constitutional debt limitation will not apply to bonds issued under Act No. 22, supra.

"This conclusion has been reached by a large majority of other courts which faced the same problem. In *Gruen* v. *State Tax Commission,* 35 Wash. 2d 1, 211 P. 2d 651, 679, the court said:

"The cases which we have considered state what must be held to be the unanimous view of the courts of this country upon the question of whether or not bonds payable out of a special fund, supplied by an excise tax, constitute a debt within the meaning of constitutional limitations fixing a general debt limitation. Based upon those cases and the cited cases decided by this court,

which indicate an approval of the special fund doctrine and, further, that excise taxes are not controlled by constitutional provisions, we hold that the issuance and sale of bonds provided for in this act do not in any way constitute a debt against the state of Washington. The bonds provided for are to be paid from a special fund and solely from anticipated revenues to be derived from the sale of cigarettes. They are not, and cannot be, a general obligation of the state. In the event the anticipated profits do not materialize and the fund becomes exhausted, the purchaser of the bonds has no legal redress against the state. He must look solely to the fund upon which they are drawn.

" 'Whether there would be a moral obligation to redeem the bonds is a matter which does not concern this court. It is sufficient to say there is no legal obligation to do so in the event the special fund is exhausted. In that event, there will be no additional tax burden by reason thereof; for, as just stated, there is no general obligation on the part of the state to redeem the bonds.' " See also the following cases: *Nichols* v. *Williams, et al.*, 338 Mich. 617, 62 N. W. 2d 103; *State* v. *Florida State Improvement Commission,* supra, *State* v. *Florida State Improvement Commission,* 160 Fla. 230, 34 So. 2d 443; *State ex rel. Fatzer, Atty. Gen.* v. *Armory Board, et al.,* supra; *Guthrie, et al.* v. *Curlin, Com'r of Highways, et al.,* Ky., 263 S. W. 2d 240.

Turning to the other moneys that will be placed in the Justice Building Fund, Sub-section (b) of Section 15 of the Act covers rental payments under the lease agreement to be executed by the Workmen's Compensation Commission and the Justice Building Commission, and the sums to be received from the sale of the Workmen's Compensation Commission building. Section 11 of the Act expressly authorizes the Workmen's Compensation Commission and the Justice Building Commission to enter into a lease for such term, containing such provisions, and for such amount as the said parties shall determine. It is contemplated that a lease will be executed and that the term thereof will extend over the life of

the bonds to be issued by the Commission. There is express legislative authorization for the contemplated long term leasing and we see no constitutional objection to the action taken by the Legislature in this regard. Long term contracts are necessarily involved in every bond issue of state agencies heretofore approved by this Court, and this Court has approved similar long term contracts dealing with other subject matter. A ten year contract under which the Board of Penitentiary Commissioners obligated itself to furnish convict labor, was upheld in *McConnell* v. *Ark. Brick & Mfg. Co.*, 70 Ark. 568, 69 S. W. 559. In *Chidester School District No. 50* v. *Faulkner*, 218 Ark. 239, 235 S. W. 2d 870, it was held that the board of directors of a school district might enter into a contract covering the employment of a teacher or other officer for a term extending beyond that of the board itself, and that such contract was binding upon succeeding boards. See annotations 70 A. L. R. 794 and 149 A. L. R. 336.

The Court stated on page 242 of 218 Ark.:

"In *Gardner* v. *No. Little Rock Special School District*, 161 Ark. 466, 257 S. W. 73, this court approved the general rule announced in 24 R. C. L., page 579, as follows: 'In the absence of an express or implied statutory limitation, a school board may enter into a contract to employ a teacher or any proper officer for a term extending beyond that of the board itself, and such contract, if made in good faith and without fraudulent collusion, binds the succeeding board. It has even been held that, under proper circumstances, a board may contract for the services of an employee to commence at a time subsequent to the end of the term of one or more of their number and subsequent to the reorganization of the board as a whole, or even subsequent to the terms of the board as a whole. The fact that the purpose of the contract is to forestall the action of the succeeding board may not, of itself, render the contract void. But a hiring for an unusual time is strong evidence of fraud and collusion, which, if present, would invalidate the contract.'

See, also, *School District No. 45, Pope County* v. *McClain*, 185 Ark. 658, 48 S. W. 2d 841.

Similar leasing arrangements have been repeatedly approved by the highest courts of other jurisdictions. In *Preston, et al.* v. *Clements, Governor, et al.*, 313 Ky. 479, 232 S. W. 2d 85, it was held that the Kentucky State Property and Building Commission could legally enter into contracts with other state agencies to rent the Capitol Annex Building when ready for occupancy. The building was to be financed by revenue bonds. In *State* v. *Florida State Improvement Commission*, 159 Fla. 338, 31 So. 2d 548, revenue certificates were to be issued to provide funds for the construction of toll roads to be payable from the income derived from fees and tolls. Before construction, it was agreed to lease the same to the State Road Department in lieu of the actual collection of tolls and the plan was upheld as being valid. In *Loomis* v. *Keehn, et al.*, 400 Ill. 337, 80 N. E. 2d 368, an act authorizing the construction of armories and the renting of the same to the state was upheld. In *State* v. *Florida State Improvement Commission*, supra, in approving a somewhat similar lease arrangement, the court states (pages 99 and 100 of 30 So. 2d):

"* * * State agencies generally have authority to contract with each other in so far as necessary to administer duties within the scope of their authority.

"* * * It is also our view that the funds collected by the Florida Industrial Commission pursuant to Chapter 440.51 (b) Florida Statutes of 1941, F. S. A., are trust funds for the exclusive use of paying its administrative expenses, that it is a voluntary assessment paid by those who take advantage of the act, that it is not a state fund and that the Florida Industrial Commission was authorized to pledge said funds in payment of the lease contract with the Florida State Improvement Commission."

See also *State ex rel. Thompson, Atty. Gen.* v. *Giessel, Director of Budget and Accounts*, 267 Wis. 331, 65 N. W.

2d 529; *Dean* v. *Kuchel,* 35 Cal. 2d 444, 218 P. 2d 521; *State ex rel. Fatzer, Atty. Gen.* v. *Armory Board,* supra.

From the above, we conclude that the contemplated long term leasing arrangement between the Workmen's Compensation Commission and the Justice Building Commission is valid. Furthermore, the Workmen's Compensation funds are designated trust funds collected and used for a specific purpose and in no sense are they funds which have been or could otherwise be available for the general or other purposes of the State, and, of course, that portion thereof to be used for rental payments under the lease never reaches the state treasury. Therefore, for the reasons heretofore set forth with reference to the additional costs levied by the Act, we find no violation of Amendment No. 20 even though the authorization set forth in Act 375 is irrevocable in the sense that it cannot be abrogated by a subsequent Legislature in such a manner as to impair the obligation of the bondholders' contract.

As to the contemplated sale of the present Workmen's Compensation building and the placing of the proceeds thereof into the Justice Building Fund to be applied to the rent of the Compensation Commission, we find no diversion of funds because they will still be utilized for Workmen's Compensation purposes, and, as previously pointed out, the Legislature can bestow its bounty where it wishes. Also, all objections to the disposition of state property appearing in the decision of this Court in *Harris* v. *Emmerling,* 224 Ark. 40, 271 S. W. 2d 618, decided October 11, 1954, appear to be fully complied with.

The situation existing with reference to the lease agreement to be executed by the Public Service Commission and the Justice Building Commission is the same as in the case of the Workmen's Compensation Commission, and what has been heretofore said in this opinion with reference to the validity of the Compensation Commission lease is applicable and controlling as to the Public Service Commission lease. There is, in our opinion, no violation of Amendment No. 20 in either instance.

Any other funds that will be supplied by the State, covered by Sub-section (d) of Section 15, will be on a current basis and pursuant to no obligation on the part of the State to supply any such funds.

The only obligations of the State of Arkansas with reference to these bonds are entirely negative in form, being those in connection with the constitutional impairment of contract provisions, and since these obligations are with reference to clearly designated special funds, which never find their way into the state treasury, and which have not been and cannot be available for the general or other purposes of the State, and since there can be no obligation on the part of the State with reference to these bonds if the funds specified in the Act prove insufficient, it is our considered opinion that the bonds are not state bonds within the contemplation of Amendment No. 20. The cases relied upon by appellant are easily distinguishable. In *Opinion of the Justices,* 146 Me. 183, 79 A. 2d 753, the act made the execution of a lease to the State of Maine mandatory and in *Mc-Cutcheon* v. *State Building Authority, et al.,* 13 N. J. 46, 97 A. 2d 663, the leasing was restricted to state agencies. Furthermore, it appears that the obligations under the leases involved therein would have to be discharged from funds raised by general taxation which would otherwise be available for general or other state purposes. The obligations under the leases were not specifically restricted to designated special funds which would in no event be available for general or other state purposes, as is the case under Act 375. And, leasing is not restricted to state agencies by Act 375. As appears from the admitted facts in this case and from the authorization of the Act itself, the Justice Building Commission will covenant to charge and collect rent from the occupants of the building, whoever they may be, which, together with such other revenue of the Commission as may be available therefor, will always be sufficient in amount to insure the prompt payment of the principal of and interest on the bonds when due and to maintain an adequate reserve for contingencies, and it is entirely

possible that it may become necessary for the Commission to lease space to others.

### The Additional Costs Levied by Section 14 of the Act

The appellant contends that this section of the Act violates Article 2, Section 13 of the Constitution, which provides in part that every person ''ought to obtain justice freely and without purchase, completely, and without denial, promptly and without delay, conformably to the laws.'' This Court has held that it is within the power of the Legislature to make reasonable provisions for the payment of costs of litigation so as to help defray the expenses of the courts. *Marshall* v. *Holland*, 168 Ark. 449, 270 S. W. 609. The proper housing of the Supreme Court, the Clerk, the Library and the Attorney General is an obvious and necessary expense of the administration of justice and of our courts. These costs are levied at the circuit, chancery and probate court levels and appeals from those courts are directly to the Supreme Court. The mere fact that there are no appeals to the Supreme Court in a substantial number of cases filed in the circuit, chancery and probate courts, of which fact we take judicial knowledge, is immaterial. The right of appeal is a valuable asset to any litigant and is available to all litigants. The mere fact that these rights may not be utilized in every case does not detract from their importance and there is no constitutional objection to levying costs to contribute to the expense of the maintenance of those rights.

### Exemption from Taxation

Section 16 (f) of the Act exempts the bonds to be issued by the Commission from all taxes, state, county and municipal, including income taxation and inheritance taxation. Appellant challenges this provision as being unconstitutional under Article 16, Sections 5 and 6 of the Constitution of the State of Arkansas. We agree with the contention of the appellant insofar as property taxation is concerned. This Court has held that these provisions of the Constitution prohibit any legislative attempt to exempt bonds from property taxation at least where the bonds are held by any person or agency whose

property is not otherwise exempt from taxation. *Jernigan* v. *Harris,* 187 Ark. 705, 62 S. W. 2d 5; *Ward* v. *Bailey, Governor,* 198 Ark. 27, 127 S. W. 2d 272. However, the exemption from state income taxation is valid. *Ward* v. *Bailey, Governor,* supra; *Fulkerson* v. *Refunding Board of Arkansas,* supra; *Sims* v. *Ahrens,* 167 Ark. 557, 271 S. W. 720; 4 Ark. L. Rev. 433, Property Tax Exemption in Arkansas. And, inasmuch as an inheritance or estate tax is not a property tax, that exemption is valid. *State* v. *Handlin,* 100 Ark. 175, 139 S. W. 1112; *Gates* v. *Bank of Commerce & Trust Co.,* 185 Ark. 502, 47 S. W. 2d 806; *Wiseman* v. *Phillips,* 191 Ark. 63, 84 S. W. 2d 97.

The invalidity of the provisions of Section 16 (f) of the Act insofar as they purport to exempt the bonds from property taxation does not affect the validity of other provisions of the Act which we have herein sustained. Section 22 of Act 375, the separability provision; *Jernigan* v. *Harris,* supra.

## CONCLUSION

The action of the lower court in sustaining the demurrer, and upon the plaintiff's declining to plead further, in dismissing the complaint is affirmed.