The Honorable Mike Huckabee Lieutenant Governor State Capitol, Suite 270 Little Rock, Arkansas 72201
Dear Lieutenant Governor Huckabee:
This is in response to your request for an opinion on three questions regarding the execution of energy management performance contracts by state universities.
Specifically, you have described a "lease-purchase agreement" whereby an energy performance contractor installs energy equipment, which can range from lighting fixtures and bulbs to computerized, energy efficient heating and cooling systems. The contractor guarantees that the savings in utility and operations costs will meet or exceed the cost of the contract, with some exceptions. If the guaranteed savings are not realized, the energy performance contractor "rebates" the difference. To ensure, you note, that these agreements do not violate "restricting governmental control beyond current appropriations," these contracts contain "nonappropriation clauses," which permit the university or the state to terminate the agreement should funds become unavailable or for other reasons are not appropriated. You indicate that such contracts typically involve three principal elements, assessment and design, the installation of equipment, and the monitoring and maintenance of the energy management system. You note that the contractor retains one hundred percent responsibility for maintenance and operation of the installed equipment.
In your request, you reference a particular proposed energy management performance contract to be entered into by the University of Arkansas for Medical Sciences ("UAMS"). You note that the Board of the University issued a "RFP" or "request for proposals" and selected one contractor to undertake the energy improvements. The documents surrounding the transaction were submitted to Arkansas State Building Services ("SBS"), for approval. State Building Services has taken the position that state universities do not have the authority to enter into this type of lease-purchase agreement, and you indicate that its reason is based upon a prohibition against financing "labor" for longer than a twenty-four month period. You note that the contractor's legal counsel has concluded that, under Arkansas statutes, there is a "good faith" argument that an energy management performance contract is a contract for the purchase of "commodities and services." As such, the agency purchasing official would have authority to enter into the contract with the contractor, under the "Arkansas State Purchasing Law" (A.C.A. 19-11-201 to -261), without the approval of SBS.
In light of these facts, you have asked my opinion on the following three questions:
 1. Does the Board of Trustees of a state university have the authority to enter into an energy management performance contract, as described above?
 2. Is an energy management contract a contract for the purchase of commodities and services or a contract for capital improvements, and what is State Building Services' role with regard to each as related to the authority of state universities' Boards of Trustees?
 3. Is energy conservation equipment considered real or personal property for purposes of lease, lease-purchase and installment contracts by state universities, and what is State Building Services' role relative to these contracts by state universities?
I interpret your first question as inquiring whether, as a substantive matter, it would be lawful for the Board of Trustees of a state university to enter into the type of lease-purchase transaction contemplated by your request. This issue will involve whether any constitutional or statutory provision would prohibit this particular type of transaction and mode of financing. The procedural requirements for executing such a contract, and the necessary channels of approval will be dealt with in response to your second and third questions, which involve the role of State Building Services.
In response to your first question, a similar issue was addressed in Op. Att'y Gen. 93-160. Although that Opinion concluded that the question presented therein was too general for a specific response, it did set out one potentially applicable constitutional prohibition. It was noted that:
 [E]xcept as authorized in Amendment 65 to the Arkansas Constitution with regard to `revenue bonds' as defined therein, the State is prohibited from issuing `bonds or other evidence of indebtedness pledging the faith and credit of the State or any of its revenues for any purpose whatsoever, except by and with the consent of the majority of the qualified electors of the State voting on the question at a general election or at a special election called for that purpose.'
Op. Att'y Gen. 93-160 at 1-2, quoting Amendment 20 to the Arkansas Constitution.
The State cannot, therefore, issue any "evidence of indebtedness" pledging the "revenues" of the state, without the approval of the electorate. The issue with respect to an energy management performance contract will therefore turn upon whether an "evidence of indebtedness" is created by the lease-purchase agreement, and if so, whether any "revenues" of the "state" are "pledged" to it, such that a vote of the electorate is required under this provision prior to its execution. As we will see, the Arkansas Supreme Court has had little trouble concluding that a similar lease purchase arrangement created an "evidence of indebtedness," at least for purposes of the constitutional limitation on municipal debt. See Brown v. City of Stuttgart, 312 Ark. 97, 847 S.W.2d 710
(1993). Additionally, in my opinion, appropriated funds in the UAMS budget, which I assume will be used to make payments to the contractor, are likely "revenues" of the state as that term is defined in Davis v. Phipps, 191 Ark. 298, 85 S.W.2d 1020
(1935) (defining the term as including "the annual or periodic yield of taxes, excises, customs, etc., which the State collects and receives into the treasury for public use. . . .") Our inquiry under Amendment 20 must focus primarily, therefore, upon whether these revenues are "pledged" in an unconstitutional sense, to the payment of this evidence of indebtedness.
Another potentially applicable constitutional provision is Arkansas Constitution, art. 5, 29, which provides as follows:
 No money shall be drawn from the treasury except in pursuance of specific appropriation made by law, the purpose of which shall be distinctly stated in the bill, and the maximum amount which may be drawn shall be specified in dollars and cents; and no appropriations shall be for a longer period than two years. [Emphasis added.]
This provision may be implicated, if, as I understand the facts, the payments to be made under the lease-purchase agreement (although limited to the amount of energy savings occasioned by the contract), will actually be made from appropriated funds of the University. In addition, this may be the provision to which SBS refers when it states that it is unlawful to "finance labor" for more than twenty-four months. The so-called "nonappropriation" clause in the lease-purchase contract is a device which attempts to alleviate each of the constitutional problems listed above. That is, such clauses attempt to negate the existence of a "pledge" of revenues with regard to Amendment 20, and attempt to limit the appropriation to a biennial basis for purposes of art. 5, 29.
In order to analyze the lease-purchase agreement under the above constitutional provisions, it is necessary to determine how these provisions have been interpreted by the Arkansas Supreme Court. A 1955 case sheds some light on the issues raised. In McArthur v. Smallwood, 225 Ark. 328, 281 S.W.2d 428
(1955), the Arkansas Supreme Court was required to pass upon the constitutionality of Act 375 of 1955, an act which created the Justice Building Commission and authorized the Commission to construct a Justice Building on the capitol grounds in Little Rock, through the issuance of bonds to be payable from and secured by funds received from the rental of space in the building by state agencies, from moneys received from county treasurers from additional costs taxed under the act, from state appropriations on a current basis, and from gifts, bequests and donations. (The relevant funds for our purposes are the "state appropriations on a current basis.") The court had to analyze whether the use of any of these funds violated Amendment 20. The court held generally that the pledge of so-called state or public revenues is not prohibited by Amendment 20 unless the pledge is to the payment of "bonds of the State of Arkansas." The court further held that to determine whether bonds can be so classified, it is necessary to analyze the funds that will be pledged to the obligations. Finally, the court held that the irrevocable pledge of the funds at issue in McArthur, was a pledge of "special funds" only, which had never before and would never thereafter be available for the general or other purposes of the state, and as such, the pledge did not violate Amendment 20. The court, however, did not specifically indicate how the pledge of the appropriations on a current basis were "special funds." The payments received in rent from the state agencies in question were never placed in the state treasury and appropriated, but were paid directly to the agency funds and then towards the bonds; the additional costs levied by the act were directed to a special fund; and of course, any gifts and bequests were not revenues of the state. But the court did not specifically address how the appropriations to be made by the General Assembly were "special funds." The appropriated funds were only a small portion of funds allocated to repayment of the bonds. In fact, if the appropriation was not made, this triggered the collection of certain court costs to fund the bonds. The court did state, with regard to the appropriated funds, that:
 There is no obligation on the Legislature to make this appropriation and there is no attempt to bind future legislatures in this particular. The appropriations, being current in nature, present no constitutional problem because they will simply amount to a bestowing by the Legislature of its bounty, and in this regard it is supreme. . . . [Citations omitted.] Furthermore, there is no constitutional objection to the making by one legislature of a continuing levy.[1]
[Citation omitted.] The only other consideration . . . is whether the levy is irrevocable.
225 Ark. at 339.
The court went on to find that the levy, presumably of the court costs, was irrevocable, but that fact did not violate Amendment 20 because the funds were "special funds."
Despite the fact that the reasoning of the McArthur decision, in my opinion, is unclear on the pledge of appropriated funds, it does stand for the proposition that appropriated funds may be applied to a long-term state agency obligation without violating Amendment 20. McArthur has not been expressly overruled.
It can be argued, however, that McArthur can both be distinguished and questioned on this point. Most of the funds at issue in McArthur were not appropriated funds; that is, they were not funds appropriated by the legislature from the State Treasury. Most of the funds were so-called "special funds," and if the legislature failed to appropriate funds, these other "special funds" would be available to support the bonds. The Supreme Court had previously held that a pledge of only such funds did not violate Amendment 20, (see Jacobs v. Sharp,211 Ark. 865, 202 S.W.2d 964 (1947) (pledge of University dormitory fees to bond issue not violative of Amendment 20), and in subsequent cases upheld this aspect of McArthur. See Miles v. Gordon, 234 Ark. 525, 353 S.W.2d 157 (1962) (pledge of interest accruing on state balances, which was not placed in state treasury, to state certificates of indebtedness issued to construct capital improvements at state universities did not violate constitution); Holmes v. Cheney, 234 Ark. 503,352 S.W.2d 943 (1962) ("cash funds" received by Revenue Department received from fees for motor vehicle certificates of title could be pledged to bonds issued to construct new Revenue Building if never deposited in the state treasury); Murphy v. Epes, 283 Ark. 517, 678 S.W.2d 352 (1984) (state may issue long-term bonds without elective approval to support housing if backed by "special funds" not deposited in state treasury); and Turner v. Woodruff, 286 Ark. 66, 689 S.W.2d 527 (1985) (bonds issued to finance student loans did not violate Amendment 20 where backed by income derived from the loan notes and investments and the federal government).
Other cases, however, make clear that a pledge of tax monies to such indebtedness violates Amendment 20 if executed without an election. See Borchert v. Scott, 248 Ark. 1041, 460 S.W.2d 28
(1970) (issuance of bonds backed by tax on the transfer of real property held violative of Amendment 20, because Amendment 20 applies not only to evidence of indebtedness for which the State's faith and credit is pledged, but also to evidence of indebtedness for which any of its revenue is pledged, and real estate transfer tax was a revenue of the state).
The current state of the law, for purposes of Amendment 20 analysis, therefore, as reflected by the cases above, appears to be that a pledge of "special funds" will not require an election under Amendment 20, but a pledge of tax dollars will. The court in McArthur did, however, approve a bond issue supported in part by "appropriations on a current basis." This holding does not appear to be easily reconcilable with the pattern emerging from other supreme court cases, and may be explained by the small part that the appropriated funds played in funding the bonds, thus perhaps giving the legislature more discretion to discontinue the appropriation at its will.
It should be noted additionally, in any event, that many of the cases cited above (McArthur, Jacobs, Miles, Holmes, Murphy, and Turner) have been characterized as having been "swept away" by the Supreme Court's decision in City of Hot Springs v. Creviston, 288 Ark. 286, 705 S.W.2d 415 (1986) (Hays, J. concurring and dissenting). In Creviston, the court held that the issuance of municipal revenue bonds without an election (even if supported only by revenues of the project) violated art. 16, 1. The court had foretold of a shift in the court's attitude toward such pledges in Purvis v. Hubbell, Mayor (Purvis I), 273 Ark. 330, 620 S.W.2d 282 (1981), stating that: "After carefully considering our previous decisions, it appears there has been a gradual expansion of the concept of revenue producing bonds, which require no popular approval. . . ." The court therefore gave notice of its intention to reconsider its cases at the next opportunity. 273 Ark. at 339. This reconsideration was accomplished in Creviston. There is some indication, however, that this caveat was intended to bring into question such cases as McArthur v. Smallwood, Miles v. Gordon and Holmes v. Cheney, where bonds were approved without an election and backed by revenues far more extensive than simply those derived from the improvement itself. See Purvis v. City of Little Rock (Purvis II), 282 Ark. 102, 667 S.W.2d 936
(1984) (Hays, J. dissenting.)
Even though McArthur approved the use of some appropriated funds to back long-term bond obligations, and has not been expressly overruled, the Supreme Court may be changing its attitude on such pledges. We are, in all likelihood, presented with a situation where long term indebtedness of the state cannot be backed by tax dollars without an election, but might be backed solely by "special revenues," derived from the project itself, without an election and without violating Amendment 20. Although as stated previously, cases such as McArthur, Miles, and Holmes have not been expressly overruled, a pledge of revenues not strictly generated by the project, as in those cases, and not approved by the electorate, might be vulnerable to a challenge under Amendment 20 if addressed by the current Arkansas Supreme Court.
This state of the law presents an interesting application to the facts of your question. Although it is easy to state that the energy management project will be "self-funded" because the payments to be made on the lease-purchase agreement will not exceed the savings generated by the new equipment, it must be recognized that the operation of the equipment will not, strictly speaking, be a revenue producing undertaking. The University's electric bill may be reduced, but if state appropriated funds, raised through taxes, will be paid over to the contractor on the contract, in my opinion the pledge will not be one of "special revenues" generated by the project. The "Master Agreement" provides that the lease purchase agreement is payable entirely from the "energy cost savings accruing . . . together with any sums . . . due . . . under the energy costs saving guarantee, and such savings . . . are hereby pledged for that purpose." Master Agreement, Schedule "C," 5. Emphasis added. These funds will not, strictly speaking, arise from the project. They will be tax monies that would have otherwise gone to pay for energy costs, or other expenses of UAMS, which will now be "pledged" and paid to the contractor. These funds, which might arise, for example, from the maintenance and operation appropriations of UAMS, would otherwise be available for other purposes of the state. This is true despite the recitation in the contract that no revenues of the state or the state's "full faith and credit" shall be pledged to the debt. Master Agreement Schedule "C," 5. If such appropriated tax funds are used, therefore, under Amendment 20, an election might be required by the Arkansas Supreme Court.
The validity of a nonappropriation clause in the lease-purchase contract may also have been called into question by the Supreme Court's recent decision in Brown v. City of Stuttgart, 312 Ark. 97,847 S.W.2d 710 (1993). In Brown, the court held that a municipal lease-purchase agreement involving a garbage truck was an "interest bearing evidence of indebtedness," under Arkansas Constitution, art. 16, 1, and the fact that there was a nonappropriation clause did not keep the transaction from being considered an "interest bearing evidence of indebtedness." The court cited to the great penalty which would be incurred should the City default on the lease and that if the City should fail to appropriate funds "the cancellation of the lease results in lost equity and interest."312 Ark. at 100. Although Brown did not involve a state agency, or Amendment 20, and a primary point in the opinion was the prohibition against the municipal payment of interest, which prohibition does not apply to the state, it is indicative of the Supreme Court's attitude toward nonappropriation clauses and continuing appropriations. It has been stated in another jurisdiction that: "The overwhelming majority of jurisdictions that have considered the issue have concluded that a nonappropriation clause precludes the creation of a debt." Department of Ecology v. State Finance Committee, 116 Wn.2d 246, 804 P.2d 1241, 1246 (1991).[2] The one court cited in Department of Ecology, however, as contrary authority, reflects a similar attitude as the Arkansas Supreme Court in Brown. In Montano v. Gabaldon, 108 N.M. 94, 766 P.2d 1328 (1989), the New Mexico Supreme Court held that once a lease is accepted, the governmental entity "would be obligated to continue making rental payments in order to protect a growing equitable interest in the facility. . . ." 766 P.2d at 1330. This language sounds very similar to the conclusion in Brown that the city at issue therein would lose equity in the equipment if it exercised the nonappropriation clause. It appears, therefore, that the Arkansas Supreme Court has sided with the minority of jurisdictions by holding that a nonappropriation clause does not preclude the creation of a debt for constitutional purposes.
With regard to this particular lease purchase agreement, it should be noted that as in Brown, the only way out of the contract is by virtue of the nonappropriation clause. Built up equity would be lost upon the invocation of the clause. Additionally, it is unclear how the legislature would exercise its will over the appropriation of these funds. Presumably, the funds will be paid out of appropriations of UAMS, most likely from appropriations allocated to "maintenance and operation" of the institution. Should the legislature choose to decline to appropriate funds for this contract, it would essentially have to decline to appropriate any funds for maintenance and operation to UAMS, as the lease purchase agreement requires UAMS to "exhaust all funds legally available" prior to exercising a termination based on nonappropriation. See "Schedule C" to the "Master Agreement," "Additional Terms and Conditions for Public Entity Customers," 3(c). It appears, in this regard, that the legislature could not place a line-item restriction in the appropriations act prohibiting the expenditure of any appropriated funds for this particular contract, as such a restriction would violate the separation of powers clause and would amount to impermissible legislative administering of an appropriation. See Arkansas Constitution, art. 4, 1 and 2, and Chaffin v. Arkansas Game 
Fish Commission, 296 Ark. 431, 757 S.W.2d 950 (1988). As stated in the dissent in Department of Ecology, supra (see note 2, supra), it is very unlikely that the nonappropriation clause could ever be exercised.
Justice Dore noted the later overruling of the "special funds" exception in Washington (as with Creviston in Arkansas). He also characterized the "escape hatch" afforded by the nonappropriation clause as "illusory," noting that there was very little likelihood that it would ever be exercised as it was simply not in the best interest of the state to fail to make the payments.
Additionally, even if it is exercised, the contractor has the right to retake the equipment, and if UAMS subsequently enters into a contract for essentially the same services or functions of the equipment (prior to expiration of the original term) the contractor has a first right to receive payments up to an amount equal to the total unpaid payments under the agreement. Master Agreement, Schedule "C," 3(e). Thus, if the nonappropriation clause is exercised, and the contractor retakes the equipment, including the lighting equipment or heating and cooling equipment, as the case may be, and UAMS enters into any contract to supply lighting, heating and cooling equipment, the contractor will still be entitled to receive payments. The nonappropriation clause in reality, therefore, does not afford a reasonable escape from the contract, with the contractor's only remedy being to retake the equipment, a requirement which has been held necessary to uphold similar contracts. See, e.g., Mississippi Valley Power Co. v. Board of Imp. of Waterworks Dist. No. 1 of Van Buren,185 Ark. 76, 46 S.W.2d 32 (1932).
The entire analysis of such a contract changes, however, if the contract and the payments to be made under the lease-purchase agreement are either truly terminable each biennium, or are made not from tax dollars, but from "rents, user fees, charges, or other revenues (other than assessments for local improvements and taxes) derived from the project or improvements financed in whole or in part by such bonds, notes, certificates or other instruments or evidences of indebtedness, from the operation of any governmental unit, or from any other special fund or source other than assessments for local improvements or taxes." Arkansas Constitution Amendment 65, 3(a). In the latter case, this office has previously concluded, although there are as of yet no judicial decisions on point, that a lease-purchase agreement could be structured as a "revenue bond" under Amendment 65 to the Arkansas Constitution. See Op. Att'y Gen. 90-067 (copy enclosed). The definition of "revenue bonds" in Amendment 65 is very broad. If the lease-purchase agreement is backed by any revenues listed above, therefore, and not by tax monies, it may be drafted as a "revenue bond" under Amendment 65. The presence of the former qualification, a truly terminable biannual contract would, of course, have to be determined on a case-by-case basis with all the relevant factors considered. See, e.g., Op. Att'y Gen. 94-122 at 4.
Thus, the pledge of state appropriated tax dollars to support this particular lease purchase agreement might be vulnerable to an Amendment 20 challenge. (This being the case, Arkansas Constitution, art. 5, 29 will not be analyzed in detail.) Although the case of McArthur v. Smallwood is some authority for the use of current appropriations to pay for such long-term obligations, in my opinion its applicability and continuing validity may be questionable.[3] The only lawful and constitutional way to undertake the transaction, in my opinion, is either to draft a contract which is truly terminable each biennium, or to use Amendment 65 and draft the transaction as a "revenue bond" backed by special funds.
In response to your second question, I must note, initially, that the question of whether an "energy management performance contract" involves the purchase of commodities and services or whether it involves the acquisition of capital improvements, will depend upon the nature of the undertaking. You have indicated that these types of contracts can range from the installation of light bulbs to the installation and maintenance of computerized heating and cooling systems. The nature of the equipment and the facts and circumstances surrounding its installation would therefore have to be analyzed in order to reach a conclusive determination. This would be in the nature of a factual inquiry, which this office is not empowered to undertake in an official opinion. I can set out, however, the definition of "capital improvement" as that term is defined in the statutes applicable to State Building Services. Section22-2-102 (1) (Cum. Supp. 1993), provides as follows:
 (1) "Capital improvement" means all lands, buildings, structures, utilities, on-site and off-site improvements, and other appertaining improvements, existing or future, and all construction, repairs, alterations, and renovations thereof which are undertaken, owned, operated, or otherwise managed by a state agency. . . . [Emphasis added.]
"State agency" includes universities.[4] A.C.A. 22-2-102 (5). There is no definition in the act of "utilities" and I have found no generally applicable definition of the term in state law. Webster's Seventh New Collegiate Dictionary (1979) defines the term "utility" as meaning "service provided by a public utility (as light, power, or water) . . . equipment or a piece of equipment to provide such service or similar service." Id. at 978. (Emphasis added). Arguably, this definition is broad enough to include such items as equipment used to furnish heating and cooling equipment, and possibly, depending on the facts, certain lighting equipment. Additionally, the definition of "capital improvement" set out above includes "appertaining improvements." The word "appertaining" is defined as meaning "to belong or be connected as a rightful part or attribute." Webster's, supra, at 43. It has also been defined as meaning to belong to land upon which property stands so as to be a part of land in the legal sense. Norfolk Dedham Mut. Fire Ins. Co. v. Hamilton, 52 So.2d 495
(Miss. 1951); City of Milwaukee v. Chicago, M., St. P.P. Ry. Co., 223 Wis. 73, 269 N.W. 688 (1936); and McVeety v. Hayes,111 Wn. 457, 191 P. 401 (1920) (holding runways connecting lumber platforms at sawmill "appertained" to the sawmill even though carried on the books of the seller as assets). The use of this term probably refers to what are legally termed "fixtures." The test for determination of whether an item is a "fixture" is summarized at Black's Law Dictionary (5th Ed. 1979) as follows:
 A thing is deemed to be affixed to land when it is attached to it by roots, imbedded in it, permanently resting upon it, or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws. Ordinarily, requisites are actual annexation to realty, or something appurtenant thereto, appropriation to use or purpose of realty, and intention to make article permanent accession to property as gathered from nature of articles affixed, relation and situation or person making annexation, structure and mode of annexation, and purpose or use for which it has been made.
 Goods are fixtures when they become so related to particular real estate that an interest in them arises under real estate law; e.g., a furnace affixed to a house or other building. . . . [Emphasis added.]
Under the principles set out above, it is my opinion that the types of improvements you have outlined would most likely, depending, of course, on the facts, be "capital improvements."
The role of SBS with regard to "capital improvements" is as stated in A.C.A. 22-2-107 (Cum. Supp. 1993). The primary responsibilities for our purposes are listed at A.C.A.22-2-107(a)(1)(A), (B) and (C), and are the 1) supervising of bidding and awarding of contracts for state agency capital improvements; 2) approval of methods of finance; and 3) approval of all proposed contracts.[5]
With regard to commodities and services, SBS has no apparent role. The contracts are governed by the Arkansas Purchasing Law (A.C.A. 19-11-201 to -261) and, with regard to UAMS, are handled by the "agency purchasing official." See A.C.A.19-11-220(a)(11) (Cum. Supp. 1993).
Your third question, I believe has been answered by the foregoing discussion. The question of whether "energy conservation equipment" is considered real or personal property will depend upon whether, as a factual matter, the equipment is a "fixture." If the equipment is a fixture, it will likely be an "appertaining improvement" and thus a "capital improvement" under A.C.A. 22-2-102(1), such that SBS's approval duties are implicated. If the equipment is not considered a fixture, but rather personal property or "commodities and services," SBS has no approval authority, rather, the Arkansas Purchasing Law applies.
The foregoing opinion, which I hereby approve, was prepared by Deputy Attorney General Elana C. Wills.
Sincerely, WINSTON BRYANT Attorney General
WB:cyh
Enclosure
[1] There is, however, very definitely a prohibition against making a continuing appropriation. See Moore v. Alexander,85 Ark. 171 (1908).
[2] In a well-reasoned dissent to this case, Justice Dore outlined the history of such constitutional debt limitations, and the two exceptions for "special funds" and "current expenses" of state government which had arisen thereunder.
[3] Of course, any new Supreme Court decision could, in the judgment of the court, as in Creviston, supra, be made prospective only.
[4] Although A.C.A. 6-62-302(3) gives the Board of Trustees of the University of Arkansas the authority to "equip" any buildings of the college, it should be noted that this general statute was enacted prior to the statutes creating and empowering SBS.
[5] It is my opinion that A.C.A. 22-2-115, which grants the State Building Services Council the authority to enter into lease-purchase agreements to provide "adequate office facilities" for state agencies, is inapplicable to "energy management performance contracts." It is also my opinion that A.C.A. 6-62-601 to -613, specifically A.C.A. 6-62-606(b), is inapplicable to the facts at hand, as the entire subchapter contemplates only a sale and "lease-back" of University property.